In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1190, 09-1224, 09-1225,
 09-1226, 09-1227 & 09-1251

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

BOLIVAR BENABE, JULIAN SALAZAR, JUAN JUAREZ,
CHRISTIAN GUZMAN, STEPHEN SUSINKA, and
FERNANDO DELATORRE,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:03-cr-00090—**Ruben Castillo**, *Judge.*

ARGUED MARCH 28, 2011—DECIDED AUGUST 18, 2011

Before KANNE, SYKES, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* The Insane Deuces was a
street gang engaged in a long-running conspiracy in-
volving deadly violence and drug distribution in
northern Illinois. In 2006, a grand jury indicted sixteen

individuals involved in the gang for conspiracy under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), and related charges of murder, conspiracy to commit murder, assault with a dangerous weapon, drug distribution, conspiracy to distribute drugs, and unlawful possession of firearms. One defendant named in the indictment was not apprehended and remains a fugitive. Another pled guilty. The case against the other fourteen was severed into two trials. The appeals addressed in this opinion stem from the first trial. A second set of appeals stems from the second trial. Our opinion in that case, also released today, is reported as *United States v. Morales, et al.*, No. 09-2863, ___ F.3d ___ (7th Cir. 2011).

Seven defendants were tried in the first trial. Six were found guilty and appeal their convictions.[1] They are Bolivar Benabe, Julian Salazar, Juan Juarez, Christian Guzman, Stephen Susinka, and Fernando Delatorre. The trial of these appellants began on February 6, 2008, and ran through the return of the special RICO verdicts and forfeiture verdicts on April 23, 2008. Over the course of several weeks the government presented and the jury heard evidence that in 2002 alone, the Insane Deuces committed four murders, eleven attempted mur-

---

[1] As to the seventh, Harold Crowder, the jury reached no verdict in the first trial. He was retried with the second group of defendants and was found guilty. His appeal is part of the parallel *Morales* opinion.

ders, two solicitations to commit murder, and multiple other shootings. The evidence was presented through eyewitness testimony, the testimony of cooperating witnesses, recorded co-conspirator statements, and ballistics evidence. Eyewitnesses who were not in the gang identified the shooters in three murders and/or attempted murders proven at trial, including the identification of defendant Guzman as the shooter in a July 18, 2002 attempted murder and the August 11, 2002 murder of David Lazcano. Five former Insane Deuces testified against the defendants, describing for the jury the gang's structure, leadership, and membership, its rules and regulations, and providing horrific details of the murders and attempted murders committed by the Insane Deuces. Through search warrants, arrests, or cooperation, the government recovered firearms used in eleven of the sixteen murders and attempted murders presented to the jury at trial, directly linking the Insane Deuces to those shootings.

All six of the defendants were convicted of RICO conspiracy, 18 U.S.C. § 1962(d) (Count 1 of the Second Superceding Indictment). Delatorre and Guzman were convicted of murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(1) (Count 2), and Juarez and Salazar were convicted of conspiracy to commit murder in aid of racketeering, 18 U.S.C. § 1959(a)(5) (Counts 3 (Salazar) and 4 (Juarez and Salazar)). Delatorre, Benabe, Juarez, and Salazar were convicted of conspiracy to distribute con-

trolled substances, 21 U.S.C. § 846 (Count 9).[2] Delatorre was also convicted of assault with a dangerous weapon in aid of racketeering activity, 18 U.S.C. § 1959(a)(3) (Count 5),[3] murder in aid of racketeering activity, 18 U.S.C. § 1959(a)(1) (Counts 6 and 7), distribution of crack cocaine, 21 U.S.C. § 841(a)(1) (Count 12), and possession of a firearm with an obliterated serial number, 18 U.S.C. § 922(k) (Count 13). After a second round of deliberations, the jury returned a special RICO verdict assigning responsibility for four murders that were charged in Paragraphs 15, 16, 19, and 20 of Count 1. The jury also returned a finding with respect to Delatorre and Benabe that eighteen firearms be forfeited.[4]

Following denial of the defendants' post-trial motions, the court sentenced Delatorre, Benabe, Juarez, Salazar and Guzman to life imprisonment. Susinka was sentenced to twenty years in prison. All defendants appeal their convictions; Susinka also appeals his sentence.

The defendants' appeals present a host of issues. We address many of those issues in a separate unpub-

---

[2] Susinka also was charged under Count 9. The jury hung on that charge, which was then dismissed against him.

[3] Guzman was also charged in Count 5 but was found not guilty.

[4] The forfeiture allegation in the indictment was brought under 21 U.S.C. § 853 for firearms that were used as a part of the Count 9 drug conspiracy. It also applied to Juarez and Salazar, who waived a jury finding with respect to that allegation.

lished order issued today.[5] We address in this opinion several issues for which a published opinion may be useful: (1) the district court's decision to try the case by an anonymous jury; (2) the district court's decision to remove defendants Delatorre and Benabe from the courtroom upon their refusal to assure the court on the eve of trial that they would refrain from inappropriate outbursts in the presence of the jury; (3) the district court's denial of a motion to suppress in-court and out-of-court eyewitness identifications of Guzman as the shooter in a gang murder; (4) the district court's jury instructions; (5) the district judge's decision to provide the jury with partial transcripts during its deliberations; and (6) alleged juror "misconduct" that came to light after the verdict was rendered. Before addressing these questions we provide an overview of the Aurora Insane Deuces gang and the relevant facts. This summary, which only scratches the surface of the evidence presented to the jury, is recounted here in the light most favorable to the verdicts. Additional facts are available in our companion case, *Morales*, No. 09-2863, slip op. at 2-14, ___ F.3d at ___.

### The Aurora "Insane Deuces"

The Aurora faction of the Insane Deuces was the focus of this case. Its goal was to eliminate rival gangs and

---

[5] Our order rejects all the defendants' arguments except for one, related to Susinka's term of supervised release. We modify his sentence accordingly, but otherwise affirm the district court in all respects.

take over the streets of Aurora. Non-Insane Deuces were
a threat to this goal. As defendant Salazar explained at
a gang meeting in the summer of 2002, "They're a
threat because they're a threat to our growth, our growth,
because all of those neutron kids growin' up, they're
given' them another option to turn to somethin' else. . . .
They should only have one choice. . . . Either if you gonna
be that side . . . you gonna be on this side, you ain't got
but one choice. Turn Deuce. They stuntin' our growth."

The gang was organized into three levels of manpower:
"Seniors," "Juniors" and "Shorties." The Juniors were the
active gang members most responsible for day-to-day
operations. Seniors were older members of the gang who
were less active but advised the Juniors. The Shorties were
the youngest members of the gang, often juveniles, whose
job it was to carry out the orders of the Juniors. Juniors
were led by members who served in roles of "Junior
Governor," "Lieutenant Governor," and "Enforcer," and
similarly the Shorties were led internally by their own
"First Seat," "Second Seat," and "Enforcer." Individual
gang members advanced within the gang by committing
acts of violence, such as shooting members of rival gangs
on "missions." The gang conducted meetings for Juniors
and Shorties, called "juntas," at which the gang's business
was discussed: missions and leadership roles were as-
signed, conflicts with rival gangs were reviewed, violence
against rival gangs was planned, and intelligence was
shared. The attending members also discussed dealing
drugs, efforts to acquire firearms, the appropriate ap-
portionment of dues and fines among the members, and

how to support members who had been jailed. Insane Deuces in jail continued to enjoy the privileges of gang membership and could expect support and protection from their fellow members.

The gang had written rules, called "leyas," and also abided by other, unwritten rules. Members were required to follow orders and report "missions" to their superiors. Members were punished, or "violated," for disobeying a rule. "Violations" ranged from assignments to additional missions to being beaten to being killed. Cooperation with law enforcement warranted the worst violation. The gang also maintained a "caja," which provided members with access to a common supply of drugs, guns, and money. Members took drugs from the caja, sold them, and then returned their cost and some profit to the caja. This profit went toward the purchase of additional firearms and drugs, and for bail money. Members of the Insane Deuces also could benefit from the "free enterprise" rule, which permitted members to deal drugs on the side so long as they shared their individual profits with the gang for its benefit.

In May 2002, in a coup that would lead to the indictments in this case, an Aurora police detective recruited Orlando Rivera as a confidential source. At the time, Rivera was a Junior Enforcer of the Aurora Insane Deuces. Under the supervision of local police and federal agents, Rivera provided information about the gang's activities and began making recorded purchases of firearms and cocaine from the Insane Deuces and

their associates. In return for his cooperation with and assistance to law enforcement, Rivera was given total immunity.

Rivera also attended and recorded gang meetings and one-on-one conversations he had with members after shootings, including murders. In these recordings, gang members planned violent acts against rival gangs (including murder). They discussed their ability to make money through drug sales fronted by the caja, as well as the need for more firearms. They also discussed the gang's ultimate goal of taking over Aurora's streets, the gang's organizational structure, and its system of dues and fines. These recordings featured prominently in the trial and no doubt left an indelible impression on the jury. Over Rivera's six days of testimony, the jury heard recordings he had made of gang meetings and activities on approximately 22 dates.

Through Rivera's secret recordings, the jury heard the defendants' own statements about their activities. For example, in a recorded meeting on August 22, 2002, Delatorre confirmed that the gang was involved in the July 18, 2002 shooting of a rival Latin King. He also admitted to being the driver in the Lazcano murder, giving specific details, including the car he drove and the type of gun used. The jury heard a recorded conversation between Rivera and Delatorre on October 19, 2002, when the two met to dispose of two firearms. Delatorre told Rivera in the recording that he and other Insane Deuces killed David Morales on October 16, 2002. Law

enforcement recovered the firearms. Ballistics evidence matched one gun to the Morales murder and the other to two shootings — a September 19, 2002 attempted murder in which a bystander was shot in the back, and a September 28, 2002 attempted murder in which another bystander, a 14-year-old boy, was shot in the back and paralyzed. Other Insane Deuces admitted on tape to being involved in three murders and three attempted murders, and Salazar was recorded soliciting the commission of murder in August 2002.

*Issues Presented on Appeal*

I. *Anonymous Jury*

Ordinarily, parties have available to them the names, addresses, occupations, and locations of employment of potential jurors. They can then use this information to question potential jurors to discern possible biases. Unfortunately, in some trials, potential jurors are at high risk of harassment, intimidation, or other unwelcome and disruptive influences. To protect potential jurors and their families, the trial court may decide to withhold identifying information from the parties, although the decision cannot be taken lightly. "An anonymous jury raises the specter that the defendant is a dangerous person from whom the jurors must be protected, thereby implicating the defendant's constitutional right to a presumption of innocence." *United States v. Mansoori*, 304 F.3d 635, 650 (7th Cir. 2002), quoting *United States v. Ross*, 33 F.3d 1507, 1519 (11th Cir. 1994). "Juror

anonymity also deprives the defendant of information that might help him to make appropriate challenges — in particular, peremptory challenges — during jury selection." *Mansoori*, 304 F.3d at 650, citing *United States v. DiDomenico*, 78 F.3d 294, 301 (7th Cir. 1996); *United States v. Edmond*, 52 F.3d 1080, 1090 (D.C. Cir. 1995). Although empaneling an anonymous jury is an extreme measure, it may be warranted where "there is a strong reason to believe the jury needs protection." *United States v. Crockett*, 979 F.2d 1204, 1215 (7th Cir. 1992). The trial court therefore must weigh the defendant's and the public's interest in preserving the presumption of innocence and in conducting a useful voir dire against the dual interests of the jurors' security and their impartiality. *Mansoori*, 304 F.3d at 650.

Here, the government argued that anonymity was necessary to protect the safety of the jurors. The defendants objected. The defendants argued that potential jurors likely would be unwilling to be sufficiently forthcoming in voir dire if anonymous, and that an anonymous jury would be unduly alarmed about possible threats to their safety, prejudicing the defendants. After noting that the defendants were accused of being involved in organized crime and faced life sentences if convicted, Judge Castillo granted the government's motion. He further concluded that "the government has alleged with sufficient particularity that the defendants have a history of intimidating witnesses or otherwise obstructing justice such that they may do so in connection with this trial." In support of

this finding, Judge Castillo relied heavily on the gang's history of retaliation and intimidation of witnesses and cooperators. He noted that Salazar and Juarez, together with severed co-defendants Mariano Morales and Arturo Barbosa, were accused of conspiring to murder an individual who they believed was cooperating with law enforcement. Rivera had surreptitiously recorded these defendants arranging the murder of the suspected informant in October and November 2002. Also, severed co-defendant Steven Perez was accused of firing 29 rounds into Rivera's parents' house, injuring his father, after the gang learned of Rivera's cooperation.[6] Each of these incidents occurred more than four years before the trial began, but because one of the charged defendants was still at large and other members of the gang had not been charged and were free, the judge concluded that the gang had the means to intimidate jurors, a history of such intimidation, and that under these circumstances, juror anonymity was warranted.

On appeal, we review the district court's decision to empanel an anonymous jury for abuse of discretion. *Mansoori*, 304 F.3d at 650. We find that there was no abuse of discretion here. Judge Castillo weighed the appropriate factors, which, as *Mansoori* instructs, included the defendants' involvement in organized crime, the Insane Deuces' capacity to harm jurors, the

---

[6] The jury in the second trial was unable to reach a verdict on the charges against Perez, and the judge declared a mistrial.

Insane Deuces' previous attempts to interfere with the judicial process, the severity of the sentences the defendants faced if convicted, and whether publicity surrounding the case presented the prospect that the jurors' names could become public and expose them to intimidation or harassment. *Id.* at 650-51. An anonymous jury is not appropriate in every criminal trial involving organized crime. "Something more" than the organized-crime label is necessary to justify juror anonymity, such as "a demonstrable history or likelihood of obstruction of justice" by the defendants or a "showing that trial evidence will depict a pattern of violence by the defendant and his associates such as would cause a juror to reasonably fear for his own safety." *Mansoor*i, 304 F.3d at 651, quoting *Crockett*, 979 F.2d at 1216. The record in this case fully supports Judge Castillo's finding that the Insane Deuces had a history of witness intimidation, that the gang retained the capacity to strike at members of the jury, and that there was a real risk of juror intimidation. In other words, this case had the requisite "something more." The district court properly exercised its discretion to keep this jury anonymous, and we affirm its decision.

II. *Absence of Delatorre and Benabe from the Courtroom*

On February 5, 2008, the day before jury selection began, the district judge ordered that defendants Delatorre and Benabe would not be permitted to attend the trial unless and until they assured the judge that

they would not disrupt the trial. Both refused. The
judge made arrangements for them to watch a video
feed of the trial from their detention center, though
neither did. The judge also made it clear that they
could return to court to attend their trial whenever
they were willing to promise to behave. Neither ever
did so.

Joined by each of their co-defendants, Delatorre and
Benabe argue on appeal that the judge's handling
of their behavior violated their rights under the Sixth
Amendment and Federal Rule of Criminal Procedure 43.
As we explain below, the record shows that Judge
Castillo was patient and judicious in dealing with these
defendants' persistent attempts to disrupt their prosecu-
tion. He took the extraordinary step of barring them
from attending trial only after it was clear that they
intended to disrupt the trial and undermine the ability
of the other defendants and the government to have a
fair trial. Both defendants effectively consented to their
removal by their conduct, so we find no constitutional
error. We find that the district court erred under Rule 43
by barring the defendants from trial on the day before
trial rather than on the first morning of trial, but we
find that the error in timing was harmless.

### A. *Disruptions by Delatorre and Benabe*

Removal of the accused from his criminal trial will
rarely be justified, but it was justified by this record,
which we describe in detail to show the judge's efforts

to ensure that the trial would be fair for all parties before removing these two defendants from the courtroom. Delatorre played the leading role. He was represented by two attorneys, but on October 16, 2007, he filed the first of more than twenty pro se documents describing himself as "Sovereign Secured Party Creditor Fernando Delatorre." In these papers, he challenged the legitimacy of the United States government, its jurisdiction over him, and the validity of the charges brought against him. He claimed to be "sovereign" and immune from prosecution. Benabe later joined Delatorre in this effort to thwart the proceedings by his own assertions of "sovereignty" and immunity.

On October 17, 2007, the court heard argument on Delatorre's motion to suppress evidence. Delatorre appeared but refused to participate because his attorneys "refused to represent me as a flesh-and-blood human being." The next day, giving Delatorre the benefit of the doubt, the court ordered Delatorre to undergo a competency evaluation.

At a status hearing held on October 31, 2007, Delatorre referred to himself as "a secured party creditor . . . third-party intervenor." He claimed that he was not the person named in the indictment because his name was not spelled with all capital letters (as it was in the indictment). He demanded to know of the prosecutor "what legal definition exactly, legal definition of the term person are you applying to me for the purposes of these proceedings?" At the court's next status hearing,

Delatorre repeated his claim that he was "a born sovereign flesh-and-blood human being and a secured party creditor." When the court announced that there would be a hearing on the competency evaluation, Delatorre interrupted: "I need to address these various issues right here and now." The court stated the hearing was concluded. Undeterred, Delatorre continued: "Let the record reflect the Court is not allowing me to address my various issues and is intending to punish me for exercising my rights as a sovereign secured party creditor." The court then ended the hearing.

The next hearing of note was on January 11, 2008. Delatorre's attorney introduced himself, and Delatorre broke in: "Excuse me, Mr. Kling does not represent me in any way, shape or form . . . . That is all I have to say for now." Judge Castillo then found Delatorre competent to stand trial and urged him to discuss his case with his court-appointed counsel to prepare for trial. But Delatorre's disruptions continued. He told the court that his attorneys had refused to represent him as a secured party creditor and that the government had refused to respond to his requests about the basis for his prosecution. Looking ahead toward the trial, Judge Castillo advised Delatorre that any outbursts in front of the jury would prejudice him. Delatorre, however, maintained that he continued to challenge what he called the court's "subject matter and personam jurisdiction." Judge Castillo then referred to Delatorre's pro se filings and said that his requests would be denied. Delatorre asked if he would receive something

in writing, and the judge said that he would issue a minute order. Delatorre asked about the nature and content of the forthcoming order. Judge Castillo told him that while he might be unhappy with the ruling, he could appeal. Delatorre continued his protests. Judge Castillo asked him to be quiet, and Delatorre responded, "I'm going to politely honor that request." He did not.

Instead, as the judge tried to move on, Delatorre interrupted to ask the court again about his pro se filings. Judge Castillo responded, "I think I already asked you, Mr. Delatorre, if there was anything else you wanted to cover." Undeterred, Delatorre continued:

> DELATORRE: Well I did. You asked me to remain silent though. You asked. You responded that I do so, but I would like to continue to speak, if that would be possible. Can I?
>
> COURT: I would ask you to remain silent then because I think I've covered it.
>
> DELATORRE: Then I'm going to have to honor that —
>
> COURT: Are there any other pro se motions?
>
> DELATORRE: — because you have not answered my questions.
>
> COURT: No, I'm asking you to remain silent at this point.
>
> DELATORRE: And I'm asking you to respond to my questions.

Delatorre then continued for several more pages of transcript without interruption, demanding an explanation

of the gold fringe on the flag in the courtroom, repeating his jurisdictional objections, and making assertions such as: "No one can explain to me why the United States has to operate as a corporation. No one can explain to me that there is, in fact, a distinction between the united 50 union states and the United States federal government. No one can explain to me who's, in fact, bringing this claim or charge against me."

By this time, Judge Castillo, the prosecutors, and defense counsel were justifiably concerned about the prospect that Delatorre would disrupt the trial, prejudicing himself and his co-defendants. Judge Castillo asked the prosecutors how they wished to proceed with Delatorre, and several co-defendants then moved for severance. Judge Castillo said at this point that it was becoming increasingly likely that Delatorre would continue in his sovereign-citizen assertions out of turn and in front of the jury. He expressed his reluctance either to remove Delatorre from the courtroom or to bind and gag him at trial.

At the next status conference, on January 29, 2008, Delatorre tried to seize the agenda by repeating his jurisdictional challenges. Judge Castillo allowed him to talk and then explained once again that he rejected Delatorre's jurisdictional challenges, and reasonably asked Delatorre whether he could refrain from disrupting the trial. Delatorre refused to answer. After listening to more of Delatorre's ramblings, the court asked once again: "My question to you is once we start picking the jury . . .

will you allow your attorneys to speak for you during the
jury selection and trial?" Again, Delatorre did not an-
swer. Instead he asserted that his attorneys were refusing
to represent him "as a flesh-and-blood human being," that
his name was spelled incorrectly in the indictment, and
that he needed the court to prove that the government
had jurisdiction over him. He insisted that he did not
consent to the proceedings and that he was a sovereign
and thus immune from prosecution. With admirable
patience, the court again asked, "Are you going to allow
Mr. Kling and Mr. Huyck to represent you and stay
silent while we select a jury next Wednesday?" The judge
explained that "if you disrupt the jury selection, I'm going
to have no choice but to have you removed from the
courtroom. Do you understand that?"

Delatorre's disruptions continued. After warning him
once more that "the consequences of continuing along
these lines will be you being removed from the trial and
the trial will proceed without you," Judge Castillo
ordered him removed from the courtroom. Delatorre
had been the only defendant to appear at the January 29
conference in person; the other defendants (including
Benabe) were represented by counsel but were not them-
selves present, having waived their right to appear.

The following day the court issued an opinion rejecting
Delatorre's sovereign-citizen theories and recounting the
history of his disruptive behavior. The written opinion
again warned Delatorre "that his continued failure to
obey this Court's orders could result in him being

barred from the courtroom during jury selection or trial to avoid potential prejudice to his six co-Defendants and to himself." *United States v. Delatorre*, 2008 WL 312647, at *3 (N.D. Ill. Jan. 30, 2009).

At a status conference hearing on January 31, Judge Castillo asked defense counsel to read the January 30 order and to share it with each of the defendants. With all defendants present, the judge said that before the start of the trial, he would ask "each defendant if they intend to speak during the trial without . . . court permission. And any defendant who responds in the affirmative will be held at the [Metropolitan Correctional Center] from day one of the trial and will see the trial from a seat at the MCC. I will not allow any defendant to prejudice any of the other defendants on trial before any of the prospective jurors." The judge stated that "any further attempts by Mr. Delatorre or any defendant to disrupt this trial will have to be interpreted by me as a willingness on the part of that defendant to watch the trial at the MCC, and I will make arrangements to ensure that that happens."

After these warnings at the beginning of the January 31 status conference, defendant Benabe interrupted and began to pursue the same disruptive course that Delatorre had followed. Benabe began to protest the court's jurisdiction by stating that he was "a secured-party creditor, third-party intervenor" and that he was not the "all-capital, corporate fiction person, debtor, straw man" named in the indictment. He demanded "docu-

mented evidence" that the court had jurisdiction over him as a "born sovereign, flesh-and-blood human being." The trial court referred Benabe to its January 30 opinion and stated that it was a "bad sign" that Benabe did not want to read the opinion. The court again warned Benabe that before the trial started, "I will ask you whether or not you're going to make statements without . . . court permission during the trial. If you give me no answer or if you say that you will, I will hold you at the MCC while the trial proceeds." When Benabe continued to demand proof that the court had jurisdiction over him, the court ordered him removed from the courtroom. (After his removal, Benabe filed multiple pro se documents on February 4 that echoed his January 31 assertion of "sovereign citizenship.") After Benabe's removal from the courtroom, Delatorre joined in again, saying, "I'm not a defendant, but I have an unresolved issue that I would like to address." He was also removed at that point.

Things came to a head on February 5 — the day before jury selection would begin. All defendants were present for another status hearing. True to his word, Judge Castillo inquired whether counsel had received the January 30 opinion, whether defendants had read it, and whether each defendant agreed not to make any statements to the jury without permission. All agreed except Delatorre and Benabe. Benabe refused to answer the court's question. Instead, he erupted with another tirade about "illegal prosecution." The court had him removed.

When it was his turn, Delatorre said he had not read the opinion. The prosecution provided him with a copy, but Delatorre refused to read it, supposedly because it did not address him by his "birth given name." The judge asked him again whether he intended to make statements to jurors without permission. Following Benabe's lead, Delatorre refused to answer. Instead, he proffered a written "Affidavit of Truth," the second paragraph of which asserted: "That the undersigned Affiant intends to fully cooperate with the Court's proceeding during and throughout the course of trial." The judge accepted a copy of Delatorre's document, and then repeated his question orally. Delatorre's only response was to deflect the court's question by asserting: "I've addressed your concerns out of fear of my life and of physical harm in writing." This exchange occurred twice more. Finding that Delatorre had refused several times to confirm that he would not interrupt the jury selection or trial, the court ordered him removed.

The court explained that the MCC would provide Delatorre and Benabe with a room with a live video feed from the courtroom, and that they could watch the trial from there if they wished. The court made it clear that Delatorre and Benabe were free to return to the courtroom at any time if they would "indicate that they will not speak in front of the prospective jurors or the final jury . . . without the permission of this Court, as long as they'll abide by simple courtroom behavior." Counsel for Delatorre objected, asserting that Delatorre had not yet acted up in the presence of jurors and that he should not be removed preemptively.

The court's response pointed out the unusual challenges posed by Delatorre's behavior in jury selection for a trial expected to last several months, with a panel of prospective jurors who had been screened already for their ability to serve in such a long trial:

> Mr. Delatorre . . . has disrupted, and the record will reflect that, every single one of the last proceedings. He has interrupted me repeatedly. . . . You're asking me to get 120 or so prospective jurors who have been carefully selected who will probably go through a snow storm to get here and to taint them with one of his outbursts, and at which point we will have to delay the trial again, while we try and put together a required jury pool. I'm not willing to do that . . . and I don't think any defendant should control a federal courtroom to that extent.

The judge did not need to add how difficult it would be, and how long it would take, to clear all of the necessary calendars of the court and counsel to reschedule the trial if Delatorre or Benabe were permitted to disrupt jury selection and taint the panel of prospective jurors.

On February 6, 2008, the first day of trial, counsel reported that Delatorre and Benabe had both refused to see them that morning, although both were in the lockup in the courthouse. The court reminded counsel that there was a video feed to the MCC in the event that Delatorre or Benabe wanted to watch the trial, and overruled counsel's renewed objection that the defendants had been removed before they were actually disruptive.

Jury selection began. The court informed the prospective jurors that Delatorre and Benabe "have been excused from attending the trial . . . for reasons that have nothing to do with the merits of the trial." After reminding the prospective jurors of the presumption of innocence, the court inquired whether the absence of Delatorre and Benabe would affect any of them one way or the other. Prospective jurors who indicated that they could not be neutral or had feelings about the issue were excused for cause without objection.

As trial progressed, the court repeatedly asked whether Delatorre and Benabe were willing to attend the trial. Delatorre and Benabe refused to communicate with their attorneys, and the trial proceeded without them. Neither defendant watched the live video feed of the trial at the MCC.

B. *Analysis*

Delatorre and Benabe argue that the trial court violated their rights under the Sixth Amendment and Federal Rule of Criminal Procedure 43(c) to be present at all stages of trial by removing them for their behavior. They assert that removing a misbehaving defendant before trial has begun is a per se violation of that defendant's Sixth Amendment rights. They also argue that their behavior was not terribly disruptive, and that even if their pre-trial behavior did rise to such a level that there was a real risk that trial could not proceed, the court was required to follow a "hierarchy of remedies." In

their view, removal is a last resort available only after a defendant has been bound, gagged, shackled, and held in contempt.

We first address whether the defendants' argument that their conduct never rose to a level that would have required their removal. We then address their arguments that their removal violated their rights to be present under the Constitution and then Rule 43. We hold that by their conduct, Delatorre and Benabe consented to their removal from the courtroom during trial, unless and until they were ready to promise to behave. The record demonstrates that Delatorre and Benabe knowingly and voluntarily waived their constitutional right to be present, and the district judge did not err by removing them from the courtroom. That waiver resolves the Sixth Amendment issue. However, the defendants were not "initially present" at trial before being warned and removed, which Federal Rule of Criminal Procedure 43(c) explicitly requires. In this respect the trial court erred, but on this record there was no difference between ordering the defendants removed on the day before trial rather than waiting until the morning of trial. The Rule 43(c) error was harmless.

### 1. *Defendants' Misconduct*

A threshold question raised by the defendants is whether their conduct justified their removal. Although they now admit that their tactics were "ill-advised," they contend that their pre-trial behavior was not a valid

predictor of how they would behave before a jury, and that their behavior was never so disorderly, disruptive, or disrespectful that the trial could not have been conducted in their presence. Delatorre also argues that in fact he did comply with Judge Castillo's request that he promise not to disrupt the trial in his written "Affidavit of Truth."

True, neither Delatorre or Benabe behaved in a violent, threatening, or obscene manner. They cloaked themselves in politeness, often saying "please," "thank you," and "excuse me." But there is no question that their frequent and undeterred outbursts, in which the defendants declared themselves to be "sovereign citizens," "secured-party creditors" and "flesh-and-blood human beings" who were somehow outside the jurisdiction of the court, were obstructive, disrespectful, and potentially inflammatory. The defendants regularly spoke out of turn, sidelined the legitimate business of the court, and wasted valuable judicial resources with their baseless immunity claims. The district judge was rightly concerned that Delatorre and Benabe would speak out of turn and espouse their theories in front of the jury, causing confusion, prejudicing their co-defendants, and tainting a carefully screened jury pool. In that equation, the defendants' relative politeness simply does not matter, and we will not second-guess Judge Castillo's assessment.

We are also unpersuaded by the defendants' argument that their pre-trial behavior was not an appropriate predictor of how they would behave before the jury.

These defendants were relentless in their interruptions, consistently attempting to derail nearly every pre-trial status conference they attended. Nevertheless, after clearly explaining the risks and consequences, Judge Castillo gave them each one final opportunity to assure him that they would not disrupt the proceedings after the case was called and the prospective jurors brought into the courtroom. They each refused to give that assurance. The combination of their pretrial behavior and their refusal to promise to control their behavior at trial was a sufficiently reliable indicator of trouble, threatening the ability of the other defendants to receive a fair trial. Judge Castillo did not err in relying on these defendants' past performances and their refusals to promise to behave appropriately before the jury.

Delatorre argues that Judge Castillo failed to acknowledge that in his written "Affidavit of Truth" of February 5, he did as Judge Castillo asked and promised to refrain from outbursts before the jury, making his promise in writing because he feared for his life. Paragraph 2 of his affidavit stated that he "intends to fully cooperate with the Courts proceedings during and throughout the courts of trial." The first problem with Delatorre's argument is the rest of his affidavit. Paragraph 2 contained his promise to refrain from outbursts, but paragraphs 1, 3, 4, 5, 6, 7, and 7A (of eight total paragraphs) echoed the same nonsensical assertions of sovereignty and immunity that Delatorre had advocated in disrupting the prior proceedings. Judge Castillo reasonably dismissed para-

graph 2 of Delatorre's Affidavit of Truth as meaningless, given its context. Second, there was no evidence, then or now, that Delatorre's life was in any danger. After Delatorre's repeated outbursts and his ongoing disrespect for the court, the prosecution, his own counsel, and the proceedings, Judge Castillo's demand that Delatorre state openly and on the record that he would cease his outbursts was reasonable. We find no error in the judge's interpretation of Delatorre's refusal to answer a direct question in open court as a clear threat that Delatorre intended to disrupt the trial.

Our intention is not to quash the presentation of creative legal arguments or novel legal theories asserted in good faith. But the arguments raised by these defendants were not in good faith. We have repeatedly rejected their theories of individual sovereignty, immunity from prosecution, and their ilk. See *United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005); *United States v. Hilgeford*, 7 F.3d 1340, 1342 (7th Cir. 1993) (rejecting the "shop worn" argument that a defendant is a sovereign and is beyond the jurisdiction bounds of the district court); *United States v. Sloan*, 939 F.2d 499, 500-01 (7th Cir. 1991); *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990) (describing defendant's proposed "sovereign citizen" defense as having "no conceivable validity in American law"); *United States v. Phillips*, 326 Fed. Appx. 400 (7th Cir. 2009) (dismissing jurisdiction arguments as frivolous because federal courts have subject matter and personal jurisdiction over defendants brought before them on federal indictments alleging violations of federal law).

Regardless of an individual's claimed status of descent, be it as a "sovereign citizen," a "secured-party creditor," or a "flesh-and-blood human being," that person is not beyond the jurisdiction of the courts. These theories should be rejected summarily, however they are presented. These defendants raised their immunity arguments with the trial court, which properly dismissed them. But for these defendants, once was not enough. Rather than acknowledging the court's ruling (and, if they wished, saving their arguments for appeal), these defendants continued to interrupt the proceedings in a campaign to obstruct the trial. In doing so, they crossed the line, entering the territory of abuse of the judicial process. Judge Castillo did not err in acting on his valid concern that Delatorre and Benabe would continue on their campaign of confusion and obstruction in the presence of the jury at the risk of prejudicing the venire and necessitating a delay of the proceedings.

2. *Due Process and the Sixth Amendment*

After issuing a warning, the trial court in *Illinois v. Allen*, 397 U.S. 337 (1970), removed from the courtroom a criminal defendant who was spewing threats and other abuse. In upholding the trial court's decision to expel Allen from the courtroom, Justice Black wrote:

> It is not pleasant to hold that the respondent Allen was properly banished from the court for a part of his own trial. But our courts, palladiums of liberty as they are, cannot be treated disrespectfully with impu-

nity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes. As guardians of the public welfare, our state and federal judicial systems strive to administer equal justice to the rich and the poor, the good and the bad, the native and foreign born of every race, nationality, and religion. Being manned by humans, the courts are not perfect and are bound to make some errors. But, if our courts are to remain what the Founders intended, the citadels of justice, their proceedings cannot and must not be infected with the sort of scurrilous, abusive language and conduct paraded before the Illinois trial judge in this case.

*Allen*, 397 U.S. at 346.

Yet, a criminal defendant's right to be present at trial is constitutional bedrock. The Sixth Amendment provides in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense." There is no question that under this Amendment, the accused has a right to be present at trial. See *Allen*, 397 U.S. at 338. The Due

Process Clauses of the Fifth and Fourteenth Amend-
ments offer additional protection. For due process, a
defendant must be present "to the extent that a fair and
just hearing would be thwarted by his absence." *Kentucky
v. Stincer*, 482 U.S. 730, 745 (1987), quoting *Snyder v.
Massachusetts*, 291 U.S. 97, 107-08 (1934).

In reconciling these competing interests, the law allows
criminal defendants to waive their constitutional right
to be present at trial. See *Diaz v. United States*, 223 U.S. 442,
455 (1912) ("where the offense is not capital and the
accused is not in custody, the prevailing rule has been,
that if, after the trial has begun in his presence, he volun-
tarily absents himself, this does not nullify what has
been done or prevent the completion of the trial, but on
the contrary, operates as a waiver of his right to be pres-
ent"); see also *Taylor v. United States*, 414 U.S. 17, 19-20
(1973) (per curiam) (discussing knowing and voluntary
waiver of right to be present at trial as sufficient for
constitutionally valid trial in absentia); *United States v.
Watkins*, 983 F.2d 1413, 1419 (7th Cir. 1993). A defendant
in a criminal trial may waive his right to be present
either "by consent or at times even by misconduct." *Snyder*,
291 U.S. at 106. In other words, a defendant's consent
to removal need not be explicit. It can be implied, based
on the defendant's actions. See *Watkins*, 983 F.2d at 1420;
see also *Taylor*, 414 U.S. at 20 (inferring consent from
an admittedly voluntary departure during trial). Such
a waiver, however, must be both knowing and volun-
tary, and the court "must indulge every reasonable pre-
sumption against the loss of constitutional rights." *Allen*,

397 U.S. at 343. A defendant who has lost his right to be present can always regain it as soon as he "is willing to conduct himself consistently with the decorum and respect inherent in the concept of courts and judicial proceedings." *Id*.

Keeping with other circuits that have addressed situations akin to this one, we conduct a three-pronged inquiry to review a district court's finding that a criminal defendant has waived his right to be present at trial. See *Watkins*, 983 F.2d at 1419; see also *United States v. Tureseo*, 566 F.3d 77, 83-84 (2d Cir. 2009); *United States v. Bradford*, 237 F.3d 1306, 1311 (11th Cir. 2001); *United States v. Davis*, 61 F.3d 291, 302 (5th Cir. 1995); *United States v. Guyon*, 27 F.3d 723, 727 (1st Cir. 1994). First, we determine whether the district court abused its discretion when it found that the accused had knowingly and voluntarily waived the right, reviewing for clear error the district court's factual finding that the waiver was knowing and voluntary. *Watkins*, 983 F.2d at 1419, citing *United States v. Fontanez*, 878 F.2d 33, 35 (2d Cir. 1989), and *United States v. Houtchens*, 926 F.2d 824, 827 (9th Cir. 1991). We will reverse if we find that the district court "left unexplored serious questions as to whether the appellant's absence was knowing and voluntary." See *Watkins*, 983 F.2d at 1419, citing *United States v. Hernandez*, 873 F.2d 516, 519 (2d Cir. 1989). Second, we consider whether the court appropriately exercised its discretion in concluding that there was a controlling public interest to continue the trial in spite of the defendant's absence. See *id*., at 1419, citing *Fontanez*, 878 F.2d at 35, and *United*

*States v. Tortora*, 464 F.2d 1202, 1210 (2d Cir. 1972). The court must consider the likelihood that the trial could take place with the defendant present, the difficulty of rescheduling, the inconvenience to jurors, and the burden on the government and others of having to undertake two trials, particularly in a multiple defendant case. See *id.*, quoting *Fontanez*, 878 F.2d at 37. Finally, if we conclude that the district court erred either in finding a knowing and voluntary waiver or in continuing the trial in the defendant's absence, we consider whether the error was harmless in light of the record as a whole. *Watkins*, 983 F.2d at 1419; see also *Stincer*, 482 U.S. at 745 (stating that the right to be present is not guaranteed "when presence would be useless, or the benefit but a shadow") (internal citation and quotation marks omitted); *Chapman v. California*, 386 U.S. 18, 22-24 (1967) (error will be considered harmless if it did not contribute to the verdict).

The record before us offers clear support for the district judge's determination that, through their tandem campaign of obstreperous interruptions and frivolous legal arguments, Delatorre and Benabe knowingly and voluntarily waived their right to be present a trial. Recognizing the stakes, Judge Castillo gave these defendants many opportunities to change course and to participate in the proceedings. They chose to abuse and disrespect those opportunities. As the judge's January 30 order made clear, he would not permit Delatorre (who, at that point, was a lone operator) to prejudice the other defendants before the jury by his behavior. Judge Castillo

notified all the defendants that Delatorre's chosen course could result in his being barred from the courtroom. Then, in open court on January 31, Delatorre and Benabe were warned orally that the judge would ask them if they intended to speak out of turn at trial, and if they refused to confirm that they would behave respectfully in front of the jury, Judge Castillo would interpret that refusal as "a willingness on the part of that defendant to watch the trial at the MCC."

The day before trial was scheduled to begin, Judge Castillo directly asked each defendant whether he agreed not to make any statements to the jury without the court's permission. All defendants agreed to this simple and basic condition, except Delatorre and Benabe. Both clearly knew at that point what would happen if they refused to promise on the record and in open court to refrain from any further outbursts. They made their choice, and the record fully supports the judge's determination that they made that choice knowingly and voluntarily. Once they were removed, the district court left the courtroom door open for them, making plain that they could return at any time during the trial upon promising to behave properly. They never did so. The record establishes that Delatorre and Benabe consented to waive their constitutional rights to be present at their trial.

Judge Castillo also appropriately weighed the public interests at stake. Five other defendants were scheduled to be tried in this complex and lengthy trial, and their

right to an impartial jury was under serious threat from Delatorre's and Benabe's behavior. The jury pool had been screened for prospective jurors who could serve for a long trial. If Delatorre and Benabe had succeeded in tainting the jury pool, it would have been a long and difficult process to put together another. Also, the schedules of the defense lawyers, the prosecutors, and the court had been cleared so that the trial could go forward as efficiently as possible. No doubt Judge Castillo had pushed off other trials and proceedings to make room for the Insane Deuces, and it would have been nearly impossible to ready any other parties to go to trial during any ensuing delay. Modern American courts simply do not have the luxury of time to indulge the obstructionist tactics of these defendants. Budgets, calendars, and administrative capacities are already too strained. Judge Castillo did not abuse his discretion in determining that the public interest weighed strongly in favor of moving the trial forward, even if that meant going forward with Delatorre and Benabe out of the courtroom. We find no constitutional error in their exclusion.

The defendants argue that the Sixth Amendment establishes a per se rule that a disruptive defendant must be present at the beginning of trial before being removed and that a trial judge must exhaust every other possible cure before removing a defendant from the courtroom. But the *Allen* Court found that the Sixth Amendment does not "so handicap a trial judge in conducting a criminal trial*." Allen*, 397 U.S. at 342. The Court commented

that, as inherently onerous as their options are, trial judges might choose to handle obstructive defendants with binding and gagging, contempt citations, or removal of the defendant, without treading on the Constitution. See *id*. at 344-46. But the Court did not make removal a last resort. Instead, the Court put its faith in trial courts to choose the best method to maintain the dignity and decorum of the proceedings in a case-by-case fashion, based on the unique circumstances presented by the defendant and the trial, while preserving the rights of criminal defendants. "We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations." *Id*. at 343. Ultimately, the *Allen* Court held that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. See *id*. That is exactly what occurred here. There was no constitutional error.


   3. *Rule 43*

We now shift gears from the Constitution to the more demanding provisions of Federal Rule of Criminal Procedure 43. The defendants argue that Rule 43 requires that

a defendant may be removed only if he is physically present at the beginning of jury selection, is seriously disruptive once, is then warned that further disruptive behavior will result in removal, and then persists in misbehavior. As the defendants read the rule, a trial court may not issue an order the day before trial excluding a defendant from the courtroom during trial, as occurred here.

Rule 43 builds on a defendant's constitutional right to be "present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n.15 (1975); *United States v. Gibbs*, 182 F.3d 408, 436 (6th Cir. 1999) (noting that rights protected under Rule 43 are more expansive than those guaranteed by the Constitution). Rule 43(a) provides that unless otherwise allowed by Rules 5 or 10, the defendant must be present at:

    (1)  the initial appearance, the initial arraignment, and the plea;

    (2)  every trial stage, including jury impanelment and the return of the verdict; and

    (3)  sentencing.

Rule 43(c) provides for waiver of a defendant's continued presence under the following circumstances:

    (1) In General. A defendant who was initially present at trial, or who had pleaded guilty or nolo contendere, waives the right to be present under the following circumstances:

(A) when the defendant is voluntarily absent after the trial has begun, regardless of whether the court informed the defendant of an obligation to remain during trial;

(B) in a noncapital case, when the defendant is voluntarily absent during sentencing; or

(C) when the court warns the defendant that it will remove the defendant from the courtroom for disruptive behavior, but the defendant persists in conduct that justifies removal from the courtroom.

If the defendant waives the right to be present under Rule 43(c), the trial may proceed to completion in the defendant's absence. But the language of Rule 43 does not provide for waiver of the right to be present unless a defendant is "initially present at trial."

This case poses the question of what exactly it means to be "initially present at trial." In oral argument, the defendants asserted that it means the defendant must be physically present at the moment when the first prospective jurors enter the courtroom (a standard that would not help in a bench trial). We do not read the rule's language as being quite that precise, given different courts' varied practices in managing jury selection, especially when a defendant is in custody and must be moved and managed out of the sight and hearing of prospective jurors. Also, we do not read the rule as requiring a district judge facing a long and multi-defendant

trial to give every defendant two opportunities to mis-behave in front of the prospective jurors in ways that could taint the jurors and prejudice the co-defendants.

We conclude, however, that the phrase "initially present at trial" in a jury trial must refer to the day that jury selection begins, though not to the precise moment that one or more prospective jurors enter the courtroom. See, e.g., *Diaz*, 223 U.S. at 455 ("In cases of felony our courts, with substantial accord, have regarded [the defendant's right to be present] as extending to every stage of the trial, inclusive of the empaneling of the jury and the reception of the verdict, and as being scarcely less impor-tant to the accused than the right of trial itself"); *United States v. Burke*, 345 F.3d 416, 422 (6th Cir. 2003) (reviewing then-existing law and determining that "trial" for pur-poses of Rule 43 denoted the time between the em-paneling of the jury and the delivery of the sentence); *Bradford*, 237 F.3d at 1309-10 (joining "every other circuit to address the issue" in holding that a trial commences under Rule 43 when the jury selection process begins); *United States v. Krout*, 56 F.3d 643, 646 (5th Cir. 1995) (finding for purposes of Rule 43 that trial begins with jury selection and noting that "our research[] does not reveal a contrary interpretation of the Rule"). As the First Circuit commented, "the concept that a defendant could go through trial proceedings to the point of selecting the entire jury and then, perhaps because he was dissatisfied with the complement thereof, freely depart, does not appeal to us." *United States v. Miller*,

463 F.2d 600, 603 (1st Cir. 1972) (same). Here, then, trial commenced on the morning of February 6, for it was not until then that the jury selection process began.

The district court's order here, issued the day before trial began, did not comply with the language of Rule 43(c). As the Supreme Court has said, Rule 43 means what it says. See *Crosby v. United States*, 506 U.S. 255, 261 (1993). But Federal Rule of Criminal Procedure 52(a) also means what it says: "Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." The difference between issuing the order on the day jury selection began and the day before it began was an error that did not affect these defendants' substantial rights. See *Rogers v. United States*, 422 U.S. 35, 40 (1975) (a violation of Rule 43 "may in some circumstances be harmless error"); *Watkins*, 983 F.2d at 1419 (applying harmless error standard to defendant's absence from trial).

With the benefit of hindsight and reflection that appellate courts are allowed, we can say it would have been better if the district court had brought the defendants to the courtroom the morning of February 6, before any prospective jurors were present, and asked them again if they wished to reconsider their choices not to attend. Assuming that the defendants had followed their pattern of prior hearings, their expected refusal to promise to behave would have justified their removal and would have complied with Rule 43.

Defendants argue that we should not make that assumption. We should assume instead, they argue, that they might have changed their minds the next day if they had been confronted with the immediacy of jury selection.

On this record, we are not persuaded. The failure to repeat once more on the first day of trial the already-repeated process did not affect the defendants' substantial rights. Unlike the defendant in *Crosby*, who fled before trial commenced, these defendants did not flee or "fail to appear." See 506 U.S. at 261-62. On the day before trial, the defendants had ample warning of the consequences of their behavior. They were repeatedly warned that the trial would go forward without them unless they promised to behave, and they made a knowing and voluntary choice. They were given an opportunity to come to court the morning of trial, but chose not to appear and refused to speak to their attorneys. At any time during the trial, they could have returned to attend the trial. They took none of those opportunities. On this record, the purpose of Rule 43 certainly was served. See, *e.g.*, *Cuoco v. United States*, 208 F.3d 27, 31-32 (2d Cir. 2000) (in context of § 2255 motion arguing ineffective assistance of counsel, commenting that *Crosby*'s holding is limited to its facts, a defendant's presence at the inception of trial assures that any waiver is knowing, and presuming that pre-trial waiver is effective if made knowingly and voluntarily); *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir. 1999) (distinguishing *Crosby* and Rule 43 from petitioner's habeas argument that his failure to appear at his trial was not a knowing and voluntary waiver of

his constitutional right to be present, explaining "the case before us amply demonstrates that in some situations the requisite knowledge can be conclusively found even if the defendant is not present when the trial begins"). The courtroom door remained open to these defendants on the morning of February 6 and every day thereafter, if only they were willing to promise to behave properly before the jury. The timing of the defendants' knowing and voluntary waiver of their right to be present did not affect their substantial rights or fail to serve the purpose of protecting their right to attend their trial. In short, the difference between removing these defendants from trial the day before trial began and the day it actually began was harmless.

The defendants argue that their absence from trial was a structural violation that could not be harmless. We disagree. It is important in this analysis to remember the precise error in question. There was no constitutional error because the defendants knowingly and voluntarily waived their presence by their conduct. The narrower error under Rule 43 was only the precise timing of the exclusion order. The defendants' absence at the instant the trial technically began was not "a defect affecting the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), nor was it an error that "necessarily rendered a trial fundamentally unfair," *Rose v. Clark*, 478 U.S. 570, 577 (1986); cf. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (erroneous deprivation of the right to counsel of choice is a structural error); *Sullivan v. Louisiana*, 508 U.S. 275, 281-82 (1993)

(denial of the right to trial by jury by the giving of a defective reasonable doubt instruction was a structural error not subject to harmless error review); *Vasquez v. Hillery*, 474 U.S. 254, 263-64 (1986) (discrimination in the grand jury is not subject to harmless error review); *McKaskle v. Wiggins*, 465 U.S. 168, 177-78 n.8 (1984) (denial of the right to self-representation at trial is not subject to harmless error review); *Waller v. Georgia*, 467 U.S. 39, 49 n.9 (1984) (denial of the right to a public trial is not subject to harmless error review); *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963) (complete denial of trial counsel was a structural error requiring reversal); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927) (fact that judge had a financial interest in conviction warranted reversal despite a lack of indication that bias influenced decisions).

To require automatic reversal for a violation of Rule 43 based on a defendant's absence at the moment trial begins would only reward these defendants for their obstructionist campaign. Delatorre and Benabe knowingly and voluntarily waived their right to be present. They maintained that waiver over the course of the entire trial. They were in complete control of their own presence or absence from the courtroom at any given moment during the proceedings against them, including when the case was called and the jury selected on February 6. A per se rule would invite future defendants to attempt similar obstructionist tactics, including waiving their right to be present from their jail cell on the day of trial. We see no reason to expand the limited list of structural rights whose violation constitutes per se error by adding

the defendants' Rule 43 right to be present at the inception of trial. The timing of the trial court's decision to remove the defendants from the courtroom, although a technical violation of Rule 43, was harmless.

III. *Eyewitness Identifications*

Guzman argues that the district court erred by refusing to strike the testimony of witnesses who identified him as the man who shot and murdered David Lazcano. We conclude that the identifications were properly admitted.

Sonya Reynolds and Ebony Pool described the August 11, 2002 murder of David Lazcano. Reynolds was driving a car directly behind the car Lazcano was riding in when both cars stopped at a traffic light. Pool was Reynolds' daughter and was riding in her car as a passenger. Reynolds saw a skinny, dark-skinned Hispanic man with short, dark hair approach. He was wearing jeans and "a light blue or whitish T-shirt with a sterling silver chain around his neck." The man approached the passenger side of the car directly in front of hers, pulled out a gun, and started shooting. Reynolds began screaming and the shooter looked at her and then ran away. She gave her first description of the shooter approximately three months after the shooting, on November 22, 2002. On that day she identified Guzman as the shooter in a photo lineup. Then, in March 2003, she identified Guzman in a live lineup, although she stated that she could not be absolutely certain of her identifica-

tion because of the amount of time that had elapsed. At trial, Reynolds identified Guzman as the person in the photo lineup whom she had identified as the shooter.

Pool also testified that she witnessed Lazcano's murder, identifying the shooter as a short, skinny, Hispanic man, with dark skin, "a peanut-shaped head," and close-cut hair, wearing blue jeans and a white T-shirt. Pool saw the man walk up to the car in front of her, pull out a gun, and shoot the passenger. The shooter looked at Pool, giving her "a full glimpse of how he looked like." On November 22, 2002, Pool identified Guzman in a photo array. In the March 2003 live lineup she ruled out all but two men, one of whom was Guzman, but stated that she could not identify him as the shooter with certainty because too much time had passed. She was not asked to identify Guzman at trial.

Guzman moved to suppress the out-of-court identifications made by Reynolds and Pool as the product of suggestive identification procedures, but he asked the court to wait to rule on his motion until after the witnesses had testified. Following Reynolds' and Pool's testimony, Guzman did not ask the court for a ruling on his motion but the court denied his motion in a minute order.[7]

---

[7] Because the district court ruled on the merits of Guzman's motion, we bypass the government's argument that Guzman filed his motion too late or abandoned it. But Guzman's failure to return to the issue prevented the issue from being well developed before the district court.

Our review of the district court's denial is de novo, but with "due deference" to the trial court's findings of historical fact. *United States v. Harris*, 281 F.3d 667, 670 (7th Cir. 2002) (resolving appropriate standard of review of a trial court's refusal to suppress an identification). In reviewing a due process challenge to an identification, we undertake a "well-settled, two-pronged analysis: (1) whether the [out-of-court identification] process was unduly suggestive, and (2) if so, whether the identification was nevertheless sufficiently reliable." *United States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009); *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007).

Guzman suggests that the out-of-court identification procedures were too suggestive because the witnesses first saw Guzman in a photo lineup and then in a live lineup. But we have previously rejected this argument in a case with very similar facts. See *Harris*, 281 F.3d at 670 ("there is nothing per se impermissible about placing the same suspect in two different identification procedures," noting particularly that six months passed between the photo lineup and the live lineup; it was unlikely after the passage of so much time that the witness was influenced by the earlier photograph). Even if Guzman could satisfy the first prong, he fails to show that the identifications made by Reynolds and Pool were impermissibly unreliable. The jury heard testimony and cross-examination regarding the highly charged, confused scene at the shooting, and the amounts of time that passed between the shooting, the photo array, and then the live lineup. Eyewitness identification of a

stranger is not infallible, but the issues regarding the reliability of these witnesses' identification of Guzman were fully aired on cross-examination for the jury to evaluate them. The issues raised by Guzman on appeal do not make Reynolds' and Pool's out-of-court identifications inherently unreliable.

Guzman also argues that if the out-of-court identification procedures were tainted, Reynolds' in-court identification of Guzman should have been suppressed, particularly because Reynolds was asked at trial if the person she had identified in the photo lineup was in the courtroom, but was not asked if she recognized Lazcano's shooter in the courtroom. Having found, however, that there was nothing improperly suggestive or unreliable about the Reynolds' out-of-court identification, Reynolds' in-court identification of Guzman as the person she had identified as the shooter in the photo lineup was not impermissible.

IV. *Jury Instructions*

The appellants contend that the district court made three errors in instructing the jury, two in the guilt phase of the trial and one in the penalty phase. A district court has considerable discretion in phrasing, organizing, and adapting jury instructions to the specific needs of the case, as long as the instructions fairly and accurately summarize the law and have support in the record. See, *e.g.*, *United States v. Jefferson*, 334 F.3d 670, 672 (7th Cir. 2003). We review de novo whether jury instructions "fairly and

accurately summarize the law," and we review the instructions in their entirety. *United States v. Webber*, 536 F.3d 584, 599 (7th Cir. 2008). We will reverse only if the instructions, when viewed in their entirety, so misguided the jury that they led to appellants' prejudice. *Id*. We find no error in the instructions the court gave in this case.

### A. *Aiding and Abetting Instruction*

The defendants challenge the district court's aiding and abetting instruction as applicable to the RICO conspiracy charge. The district court gave this circuit's pattern aiding and abetting instruction:

> A person who knowingly aids, counsels, commands, induces or procures the commission of an offense may be found guilty of that offense. That person must knowingly associate with the criminal activity, participate in the activity and try to make it succeed.

> If a defendant knowingly caused the acts of another, the defendant is responsible for those acts as though he personally committed them.

The defendants contend that the jury should have been given the following instruction applicable to the RICO conspiracy charge:

> With respect to Count One, a defendant who aids and abets the commission of that offense may be found guilty of that offense.

In order to aid and abet the commission of the offense
charged in Count One, a defendant must:

1)  know of the conspiratorial agreement alleged
    in Count One;

2)  knowingly assist in the commission of at least
    two of the predicate acts set forth in Paragraph 11
    of Count One; and

3)  try to make the conspiratorial agreement alleged
    in Count One succeed.

The key difference is the defense's proposed require-
ment that the defendant must have knowingly assisted
in the commission of at least two of the predicate acts
of racketeering listed in the indictment.

In support of their proposed instruction, the defendants
argue that the Seventh Circuit pattern instruction given
by the court was inappropriate in this case because the
conspiracy charged was a RICO conspiracy. But their
argument is based on an incorrect view of the require-
ments for proving a defendant's liability for a RICO
conspiracy. The RICO conspiracy charged in this case
under 18 U.S.C. § 1962(d) alleged a conspiracy to violate
18 U.S.C. § 1962(c), which makes it unlawful "for any
person employed by or associated with any enterprise
engaged in, or the activities of which affect, interstate
or foreign commerce, to conduct or participate, directly
or indirectly, in the conduct of such enterprise's affairs
through a pattern of racketeering activity or collection
of unlawful debt." RICO defines a pattern of racketeering

activity to require at least two acts of racketeering activity, which is defined in terms of a long list of crimes. See 18 U.S.C. § 1961(1), (5).

To prove primary liability for a RICO conspiracy under section 1962(d), the government must prove only that a particular defendant agreed that *a member* of the conspiracy would commit two predicate racketeering acts, not that the particular defendant committed or agreed to commit two predicate acts himself. See *United States v. Salinas*, 522 U.S. 52, 65-66 (1997) (resolving circuit split on this question). A RICO conspiracy case does not require proof that any racketeering acts were actually carried out. *Id.* at 63 (noting absence of overt-act requirement under section 1962(d)). Thus, by extension, to prove aiding and abetting in a RICO conspiracy, the government must prove that a defendant aided and abetted in the conspiratorial agreement, not in any alleged predicate acts of racketeering activity. The trial court instructed the jury correctly.

### B. *Pattern of Racketeering Activity*

Susinka argues that the court erred in agreeing with the government's request to modify the Seventh Circuit pattern instruction defining "pattern of racketeering activity" to include the comment that it is not necessary for the government to prove that any defendant agreed to the commission of a particular act at a particular time or place. Susinka argues that the amendment misled the jury because a "pattern of racketeering activity"

instruction must point to specific predicate acts within the indictment. Otherwise, he argues, the jury is invited to search for bad acts by the defendants to serve as predicate acts. Viewing the amendment to the "pattern of racketeering activity" instruction given by the trial court as part of a whole, we do not share Susinka's concern that the jury may have been misled. The predicate acts were properly defined in the instructions. It was not necessary for the government to prove that any of these acts occurred at a particular time or place, only that the defendants conspired to commit two of the predicate acts. The instruction was correct.

C. *Pinkerton Instruction*

The defendants also contend the district court erred by giving a *Pinkerton* instruction in the penalty phase of trial when a similar instruction had not been given in the guilt phase. The maximum penalty on a criminal RICO charge depends on the penalties for the underlying racketeering activity: the maximum sentence is 20 years unless the RICO violation is "based on a racketeering activity for which the maximum penalty includes life imprisonment." 18 U.S.C. § 1963(a). After the jury had reached its verdicts of guilty on most charges, including the RICO conspiracy charge, the district court instructed the jury to determine whether the defendants had been criminally involved in four of the murders included in the indictment. Such a jury finding was necessary to comply with the requirements of *Apprendi v. New Jersey*, 530 U.S. 466 (2002).

To guide the jury in making these determinations, the court gave the jury a pattern instruction based on *Pinkerton v. United States*, 328 U.S. 640, 647-48 (1946): "A conspirator is responsible for offenses committed by his fellow conspirators if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy." The defendants argue first that the *Pinkerton* instruction should have been given, if at all, in the first guilt phase of the jury determinations, and that giving the *Pinkerton* instruction only in the second penalty phase risked broadening the scope of the defendants' criminal liability. We disagree.

*Pinkerton* does not define participation in a conspiracy. It confers vicarious responsibility for acts of co-conspirators, and the district court reasonably concluded that such an instruction would be inappropriate in the verdict phase. We have noted the need for caution in using *Pinkerton* instructions in RICO conspiracy charges. See *United States v. Neapolitan*, 791 F.2d 489, 505 n.7 (7th Cir. 1986), modified on other grounds by *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961 (7th Cir. 2000), quoting U.S. Department of Justice, *RICO: A Manual for Federal Prosecutors*, at 73-74 (1985) ("the combination of RICO and *Pinkerton* could lead to unwarranted extensions of criminal liability"). Jury instructions for RICO conspiracies are challenging enough without *Pinkerton*. The district court exercised its discretion appropriately here by separating the jury's task into two phases. A verdict of guilty did not require a determination

that a particular defendant participated in the full scope of the Insane Deuces racketeering conspiracy, with all of the murders, shootings, and drug deals. But once the jury found the defendants guilty of the RICO conspiracy, the maximum penalties they each faced depended on whether the involvement of each in the conspiracy included responsibility for murders or drug crimes serious enough to authorize a life sentence. Each defendant could be held responsible for the various predicate acts charged, either as a direct participant, as an aider-and-abetter, or under *Pinkerton*. In the penalty phase, the *Pinkerton* instruction was appropriate.

The defendants also cite cases criticizing more generally the use of special verdicts in criminal cases. Benabe Br. at 51-52, citing *United States v. Jackson*, 542 F.2d 403, 412 (7th Cir. 1976); *United States v. North*, 910 F.2d 843, 911 (D.C. Cir.), modified on other grounds, 920 F.2d 940 (D.C. Cir. 1990). The cited cases did not address the special problems that arise under *Apprendi*. The district court's approach here was a sound way to address the problem of determining the maximum penalties for these defendants.

Third, defendants argue that the *Pinkerton* instruction violated Federal Rule of Criminal Procedure 30(a), which requires a party to request jury instructions at the close of the evidence unless the court specifies an earlier time. The government did not request the *Pinkerton* instruction until after the jury had begun its deliberations on the guilt phase. We find no error. Defendants have not

cited any cases interpreting Rule 30 to impose the impractical requirement that all penalty-phase instructions be resolved before closing arguments at the guilt phase of a trial. The district court could reasonably defer the phase-two instruction issues until after the jury deliberations for phase one had begun. The district court did not err in giving the *Pinkerton* instruction in the penalty phase of the trial.

## V. *Providing Jury with Partial Transcripts*

During its deliberations, the jury requested transcripts of Orlando Rivera's testimony from several specific witnesses on particular days. Juarez objected. He argued that the requested transcripts "unduly highlight some evidence that was brought in" about him, and that the court should provide the full transcript of cross-examination and direct testimony of those witnesses after reading back the full transcripts in open court. The court overruled Juarez's objection and provided the jurors the specific portions of the transcripts they requested along with the following instruction:

> You must . . . weigh all the trial evidence and not just one particular portion of the trial. Also please note that each of the witnesses' direct testimony you have requested was also cross-examined by the defense. The entire testimony of each witness you have identified can be made available to you at your written request.

Juarez, joined by each of his co-defendants, appeals this decision. Susinka writes separately to supplement the arguments raised by Juarez in his brief. We review a district court's response to a jury question for abuse of discretion. *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2006). Here again, we find no abuse of discretion.

The defendants argue that the court should have read aloud in open court all of the testimony from each witness in question, including cross-examination, and erred in sending to the jury room only the portions of the testimony that the jury requested. Juarez bases his argument on the "possibility" that the jury might have placed undue emphasis on a small part of the testimony and failed to view the evidence as a whole. Susinka is a bit more specific, arguing that one of the requested witnesses was the only witness to link him to the February 23, 2002 shooting, so that permitting the jury to be exposed to the transcript of his direct examination without cross-examination must have been unduly prejudicial.

These arguments are speculative at best, and the defendants' concerns were addressed effectively by the court's instruction that the jury consider all the evidence, not just one portion of the trial. We assume that the jury followed the instructions it was given. See *United States v. Zahursky*, 580 F.3d 515, 525-26 (7th Cir. 2009); *United States v. Ochoa-Zarate*, 540 F.3d 613, 620 (7th Cir. 2008).

This was a lengthy trial, followed by lengthy deliberations. A hard-working jury, sifting through memories

and notes about weeks of evidence, asked for specific portions of the evidence. Responding to the request as defendants now argue, by forcing jurors, judge, counsel, and defendants to listen to a deadly recitation of days of testimony that the jury did not ask for or need, would have bordered on cruelty. The court properly exercised its discretion by giving the jury exactly what it said it needed, with appropriate cautions. The court did so after weighing the unlikely possibility that the jury might improperly overemphasize some testimony (in spite of the court's cautionary instruction) with the interest of promoting efficient jury deliberations and not unnecessarily adding to the burden of an already heavily burdened jury. We find no abuse of discretion.

VI. *Jurors 79 and 384*

During voir dire, the potential jurors were asked whether they had ever applied for or held a job with the federal government, whether they were familiar with the Aurora area, whether they had any awareness of the facts of the case, and whether they had any friends of relatives who were involved in gangs. Neither Juror 79 nor Juror 384 indicated that they worked for the government, would be prejudiced by any knowledge they had of the Aurora area, or were familiar with the facts of the case. Juror 384 had no friends or family involved in gang activity. Juror 79, when asked that question, stated that her nine-year-old child had been in a gang for two years, until age eleven. No follow-up questions to her response

were asked during voir dire. Jurors 79 and 384 were
seated on the jury. After the trial began, the judge re-
peatedly asked the seated jurors whether anyone had
tried to talk to them about the case, whether they had
talked to anyone about the case, or whether they had
done any research outside the courtroom. Neither Juror 79
nor Juror 384 answered these inquiries affirmatively.

Nearly a month after the verdict was rendered, the
defendants raised several issues in the district court
related to the impartiality of Jurors 79 and 384. In large
part these issues were based on an affidavit from
Rachel Perez, who is a cousin of defendant Salazar and
the sister of defendant Steven Perez, who was tried
in the second trial. Ms. Perez attended the first trial
involving these appellants. After the verdicts, counsel
for the defense were made aware that Ms. Perez believed
that she recognized Jurors 79 and 384. In an affidavit,
she stated that she had worked with each of those jurors
at the post office in Aurora. She also said that she had
earlier worked with someone she believed to be Juror 79
at a company called BRK. She recalled in her affidavit
that she had had a conversation with Juror 79 at their
place of employment about the charges brought against
her brother and cousin, Perez and Salazar. Specifically,
in the fall of 2005, Ms. Perez agreed to lend her car
to Steven Perez, and when she went outside she encoun-
tered a female co-worker. When her brother arrived,
Ms. Perez introduced him to this person. Steven Perez
was very angry about something at that time, and the
female co-worker later described him to Ms. Perez as

"crazy." Approximately a week after this incident, Steven Perez was arrested and charged, and Ms. Perez told the co-worker about her brother's arrest and said that the newspapers were reporting that Salazar would also be charged. In her affidavit, Ms. Perez attested that the female co-worker with whom she had had these contacts and conversations several years earlier was Juror 79.

Two other issues arose from things Juror 79 said to the foreperson. On May 30, 2008, the trial court held a hearing at which it questioned the jury foreperson. The foreperson said that Juror 79 had informed her that her young son, who had been involved with a gang from age nine to eleven, had been a member of the Insane Deuces. Juror 79 also had said that she "knew of" one of the defendant's family members who attended court, and that she had seen some of those family members while shopping and on the train coming to or leaving court over the course of the trial. Juror 79 told the foreperson that she was concerned about seeing the defendants' family members on the train and was "a little frightened."

The defendants argue that Jurors 79 and 384 failed to honestly answer material questions at voir dire, and that, if the defendants had known the truth, Jurors 79 and 384 would have been challenged for cause. The defendants also argue that the trial court erred in denying Salazar's request that it hold a hearing at which the two jurors could be thoroughly questioned regarding their alleged omissions. We review a trial court's deter-

mination that a party has failed to show a juror was
dishonest at voir dire for an abuse of discretion. We also
review a trial court's decision to deny a motion for a new
trial on grounds of juror bias for an abuse of discretion.
See *Arreola v. Choudry*, 533 F.3d 601, 607 (7th Cir. 2008).

Neither the allegations raised in Rachel Perez's af-
fidavit nor the foreperson's testimony required that the
trial court hold a hearing so that Jurors 79 and 384 could
be questioned about any preexisting, intrinsic bias.
"[D]ue process means a jury capable and willing to
decide the case solely on the evidence before it, and a trial
judge ever watchful to prevent prejudicial occurrences
and to determine the effect of such occurrences when
they happen." *Oswald v. Bertrand*, 374 F.3d 475, 478 (7th
Cir. 2004), quoting *Smith v. Phillips*, 455 U.S. 209, 217
(1982). While due process may require a hearing to deter-
mine whether extraneous contacts may have affected a
jury's ability to be fair, the standard applies only to
prejudicial extraneous contacts, not to preexisting juror
bias. *United States v. McClinton*, 135 F.3d 1178, 1186 (7th
Cir. 1998); *Artis v. Hitachi Zosen Clearing Inc.*, 967 F.2d
1132, 1141 (7th Cir. 1992). A post-verdict inquiry into
intrinsic juror influences is almost never justified. See
Fed. R. Evid. 606(b); *Tanner v. United States*, 483 U.S. 107,
117-20 (1987) (post-verdict discovery of alcohol and
drug use by members of the jury was an intrinsic in-
fluence not requiring a hearing under the Sixth Amend-
ment: "It is not at all clear that the jury system could
survive such efforts to perfect it."); *Arreola*, 533 F.3d at 606
(in prisoner's suit alleging that doctor's treatment of his

ankle injury constituted an Eighth Amendment viola-
tion, juror's post-trial revelation of failure to disclose
a prior ankle injury in voir dire was an intrinsic influence
not requiring evidentiary hearing), citing *Marquez v. City
of Albuquerque*, 399 F.3d 1216, 1223 (10th Cir. 2005) ("[A]
juror's personal experience . . . does not constitute ex-
traneous prejudicial information.") (internal quotation
omitted). The various bases on which the defendants
brought their post-verdict contentions that Jurors 79 and
384 may have harbored secret bias were intrinsic, not
extrinsic, and no hearing was required.

The defendants also contend that they are entitled to a
new trial because they believe that Jurors 79 and 384 lied
about these issues at voir dire. To obtain a new trial, the
defendants must first demonstrate that Juror 79 or 384
failed to answer honestly a material question on voir dire,
and then further show that a correct response would
have provided a valid basis for a challenge for cause.
*McDonough Power Equipment, Inc. v. Greenwood,* 464 U.S.
548, 556 (1984).

As for Juror 79, the trial court did not find that she
withheld any information that might have indicated a pre-
existing bias, and on appeal, the defendants have not
presented us with any reason to disturb that conclusion.
Rachel Perez believed that Juror 79 had worked with her
at BRK and at the Aurora post office and that she had
talked with her about her brother's and cousin's arrest
and indictment. According to her jury questionnaire,
Juror 79 had no history of employment with BRK or

with the United States Postal Service. Also, the foreperson
testified that Juror 79 had said that she "knew of" one
of the defendants' family members who attended the
trial (correcting the court to clarify that Juror 79 had not
said that she *knew* someone in the courtroom, only that
she *knew of* someone) contradicting Ms. Perez's account
that she and Juror 79 had worked together at two dif-
ferent jobs and that they were friendly with one another.
It was entirely within the trial court's discretion to con-
clude that Ms. Perez was mistaken, that Juror 79
did not have a history of employment with the United
States Postal Service, and that the contacts that Ms. Perez
recounted did not happen, at least not with Juror 79.[8]
We see no reason to overturn that finding on appeal.

We confess that our eyebrows went up when we read
that Juror 79's young son had been a member of the
Insane Deuces. But the record shows that Juror 79 an-
swered correctly during voir dire that her son had been
involved in a gang. She did not say that it was the Insane
Deuces, but nobody asked her. The defense counsel did
not ask any follow-up questions or ask the judge to ask
them. By failing to do so, they lost their ability to seek

---

[8] The district judge also was rightly suspicious of the timing
of Ms. Perez's revelations. Ms. Perez had attended the trial,
and her affidavit did not contain the type of information that
would have been discovered only after the verdict. Yet,
Ms. Perez did not apprise defense counsel of her suspicions
concerning Jurors 79 and 384 until after the verdict had
been rendered.

a new trial on this basis. See *McDonough*, 464 U.S. at 550 n. 2; *United States v. Arocho*, 305 F.3d 627, 635 (7th Cir. 2002) (defense counsel's failure to follow-up on prospective juror's answer that he knew a potential witness "in passing" would not allow counsel to turn their misunderstanding of vague answer into a deliberate lie by juror), superseded by statute on other grounds, citing *Artis v. Hitachi Zosen Clearing, Inc.*, 967 F.2d 1132, 1142 (7th Cir. 1992) (where juror revealed in voir dire that he had been involved in union affairs, party's failure to question juror further as to union involvement until after unfavorable verdict looked like "sandbagging").

We are also not troubled that Juror 79 reported seeing members of the defendants' families on her way to and from the courthouse and outside of the courtroom in her daily life. The defendants make no allegation that she had any interaction or contact with these family members. When the trial judge asked the jury if anyone had contacted them to speak about the case, Juror 79 was under no duty to report that she had merely recognized members of the defendants' families outside the courtroom. Nothing suggested to the trial court, and nothing suggests to us on appeal, that Juror 79 intentionally withheld any information or failed to honestly answer these repeated inquiries by the trial court, or that she became biased against the defendants because of these random encounters.

Returning to Juror 384, the defendants have not identified any voir dire question related to Aurora that she

failed to answer truthfully. Although she said in her
written responses that she had worked for the United
States Postal Service in Aurora, the district court sur-
mised that Juror 384 felt she did not need to indicate
that she had worked for the postal service during voir dire
because she had already said as much in her written
questionnaire. Such a mistake by prospective jurors is
both common and understandable. Nothing suggests
that Juror 384 intentionally omitted this information
during the face-to-face questioning. She certainly did not
conceal the information. Defense counsel could have
pursued further both the written response and the
silence in court; they did neither. Defendants also have
not established, as they must, that if they had known of
Juror 384's postal employment, the information would
have been grounds to challenge her for cause. See *Dennis
v. United States*, 339 U.S. 162, 171-72 (1950) (government
employees are not barred from serving on a jury in a
criminal case); *United States v. Polichemi*, 219 F.3d 698,
704 (7th Cir. 2000) (government employment is not suffi-
cient to excuse a juror for cause). After all, several
jurors with connections to state and federal government
agencies served on this jury. Here again, we find no error.

*Conclusion*

In our companion order, we modify Susinka's sentence
to impose a term of three years of supervision upon
his release from prison. In all other respects, we affirm
the convictions and sentences of defendants Bolivar

Benabe, Julian Salazar, Juan Juarez, Christian Guzman, Stephen Susinka, and Fernando Delatorre.