# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 2, 2024

Lyle W. Cayce
Clerk

No. 21-20681

United States of America,

*Plaintiff—Appellee*,

*versus*

Lola Shalewa Barbara Kasali,

*Defendant—Appellant*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CR-54-1

_____

Before Barksdale, Southwick, and Graves, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

In April 2022, Lola Kasali was convicted of four counts of fraud based on her submission of two federal loan applications. Kasali made numerous pretrial motions to substitute counsel, which were all denied by the district court. The district court then conducted the first day of trial in Kasali's absence after concluding she had voluntarily waived her right to be present. She was present at all other trial proceedings. Kasali now appeals that judgment and her sentence. We AFFIRM.

No. 21-20681

## FACTUAL AND PROCEDURAL BACKGROUND

Congress authorized the temporary Paycheck Protection Program ("PPP") to provide forgivable loan assistance to small businesses that suffered during the COVID-19 pandemic. Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286–94 (2020) (codified as amended at 15 U.S.C. § 636(a)(36)). Businesses could apply for a PPP loan from participating lenders who, upon approval of their application by the Small Business Administration ("SBA"), would fund the loans.[1] 13 C.F.R. §§ 120.190–192; *see generally* 15 U.S.C. § 636(a)(36). The SBA fully guaranteed the loans and reimbursed the lenders if a borrowing business defaulted. 15 U.S.C. § 636(a)(2)(F), (36)(B). As part of their applications, businesses were required to state their average 2019 monthly payroll expenses and the number of employees. *PPP First Draw Borrower Application Form*, *supra* note 1; *see also* § 636(a)(36)(D)(i), (E), (G). This information was then used to calculate the size of their PPP loan. § 636(a)(36)(E).

In June 2020, Kasali submitted two PPP loan applications for the two businesses she operated: Lola's Level and Charm Hair Extensions. According to the indictment, Kasali in her applications "knowingly misrepresented the number of employees and payroll expenses" of each business and "made numerous other false and misleading statements." Kasali requested $1,937,500 for Lola's Level and $1,875,944 for Charm Hair Extensions, but she could not provide any IRS records, bank statements, or

---

[1] The SBA Form 2483 PPP loan application is available on the SBA's website and details the specific requirements for each small business that applies. *See PPP First Draw Borrower Application Form*, U.S. SMALL BUS. ADMIN., https://www.sba.gov/document/sba-form-2483-ppp-first-draw-borrower-application-form (last visited June 19, 2024).

employment records to support the information provided in her applications. As a result, one application was denied, and the approved funds from the other were frozen and seized before Kasali obtained the money.

In 2022, Kasali was convicted of two counts of making false statements to a financial institution in violation of 18 U.S.C. § 1014 and two counts of bank fraud in violation of 18 U.S.C. § 1344. During the course of the prosecution, Kasali was represented by five separate attorneys. Kasali's first two attorneys had only limited roles. Kasali's attorney-client conflicts began when her third attorney was appointed.

Kasali's third attorney moved to withdraw after six months, stating the attorney-client relationship deteriorated and Kasali refused to assist him in preparing a defense. The district court granted the motion and appointed a fourth attorney for Kasali. That attorney represented Kasali for two months before she moved to withdraw as counsel because of lack of trust, attorney-client relationship deterioration, and an inability to communicate with Kasali regarding her case. The district court granted the motion.

Kasali's fifth appointed attorney was James Stafford, who requested appointment of a female co-counsel to protect himself against Kasali's potential allegations and to help in trial preparation. The district court appointed Kasali's fourth attorney, Ashley Kaper, as co-counsel. Several problems then arose. Kasali objected to Kaper as her counsel and testified at a motion hearing that Kaper was withholding emails, refusing to obtain evidence, and questioning Kasali about things an "attorney should know." The district court then questioned Kasali on whether it was true that she refused to discuss the case and provide needed information to attain relevant evidence. Kasali would not answer the questions but argued Stafford and Kaper were not her attorneys because she had retained a different attorney. The district court described Kasali's testimony as "frivolous and fanciful"

and stated that Kasali's failure "to even assist [her] counsel [was] not a basis for disqualifying [said] counsel."

Kasali was then ordered to attend a meeting only with Stafford to review case documents and answer questions for her defense in an effort to balance her mistrust of Kaper. Stafford presented Kasali with a plea offer and attempted to discuss the evidence, but Kasali "refused to review any discovery, refused to listen to [phone] recordings, proclaimed that [Stafford] was not her attorney," and ended the meeting. When asked by the district court if this was true, Kasali testified that Stafford said he would have her convicted and that her motion to disqualify counsel was meritless. Kasali continued to argue with the district court during the hearing. The court described Kasali as "very difficult to deal with" and explained that she could be removed if her conduct persisted. The district court then denied Kasali's renewed motion to substitute counsel.

On December 6, 2021, the district court announced prior to jury selection that Kasali refused to change out of her jail clothes into street clothes and participate because she did not accept Stafford as her counsel. Stafford suggested the district court bring Kasali in before the start of trial and outside the presence of potential jurors so she could state on the record that she refused to be in the courtroom during trial. Stafford stated he hoped Kasali did not want to be present, expressing concern about the possibility of her "act[ing] up" in front of the jury. Once in the courtroom, Kasali insisted that Stafford and Kaper were not her attorneys.

The district court repeatedly asked Kasali to choose between changing into street clothes or remaining in a holding cell. Kasali responded each time the issue was not her clothes, but her attorneys. Stafford then stated they would "select the jury without [Kasali] being present." The district court determined it would likely be prejudicial for Kasali to remain in jail clothes in

front of the jury and there was a possibility she would "act out during voir dire." Kasali was therefore ordered to listen to the voir dire from a law clerk's office.

Upon completion of voir dire, Stafford and the district court again questioned Kasali on whether she would dress in street clothes and participate in trial. Kasali avoided the question and repeatedly renewed her objections to her attorneys. The district court determined Kasali had waived her right to be present at trial and would remain outside the courtroom. Kasali responded that she did "not waive [her] appearance," but she remained in a private room outside the courtroom listening to the first-day proceedings.

Another discussion about Kasali changing into street clothes and participating occurred the morning of the second day of trial. Kasali stated she would change into street clothes but was entitled to her attorney of choice. The district court deemed Kasali's answers nonresponsive and again concluded she voluntarily waived her right to be present at trial in street clothes. After being assured her participation in the trial did not waive her ability to appeal, Kasali changed into street clothes and participated in the remainder of the trial.

The jury found Kasali guilty on all four counts of the indictment. Once the district court accepted the verdict, the Government sought clarification on the district court's conclusion that Kasali had voluntarily waived her right to be present. The district court explained Kasali was present by audio on the first day but "not in the courtroom physically . . . because of her desire not to dress out and not to be present."

At sentencing, the district court accepted the initial Presentence Report's ("PSR") conclusion that the intended loss associated with Kasali's fraud was $3,813,444, which required an 18-level sentencing enhancement.

Accordingly, the district court determined a low-end "[G]uideline sentence [wa]s appropriate" and sentenced Kasali to 70 months of imprisonment and five years of supervised release on each count to run concurrently. Kasali was also ordered to pay $2,027,686.64 in restitution to the SBA. Kasali timely appealed.

## DISCUSSION

Kasali asserts the district court erred in (1) denying her motions to substitute counsel, (2) conducting the first day of her trial in her absence, (3) applying a sentencing enhancement under intended loss, and (4) awarding restitution to the SBA when no actual loss occurred. We analyze the arguments in that order.

### I.  *Motions to substitute counsel*

We review a district court's denial of a motion to substitute counsel for abuse of discretion. *United States v. Jones*, 733 F.3d 574, 587 (5th Cir. 2013). Kasali contends the district court here abused its discretion when it denied her numerous motions to substitute counsel in two ways: (1) its inquiry into her dissatisfaction with her attorneys was insufficient, and (2) the record established clear conflicts of interest and a complete breakdown in communication with her attorneys. Kasali argues the district court failed to "adequately inquire into the conflict and break-down in communication that existed" and instead focused "on the counsel's abilit[ies]." Further, even if the inquiry is deemed adequate, she argues the irreconcilable conflicts and complete breakdowns in communication constituted good cause to substitute counsel.

"[T]he Sixth Amendment guarantees a defendant the right to be represented by [a] . . . qualified attorney." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006) (citation omitted). This includes a right to retained counsel of choice, but not a right to appointed counsel of choice. *United*

*States v. Conlan*, 786 F.3d 380, 391 (5th Cir. 2015).  A court is required to substitute appointed counsel "only if there is a substantial conflict or problem affecting the ability to represent the defendant," meaning either "a conflict of interest" or "a complete breakdown in communication."  *Id.* (quotation marks and citation omitted).  This means the defendant must show "good cause" for substitute counsel.  *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973).

When faced with a motion for substitution of counsel, a court has a duty to make an adequate inquiry into the alleged conflicts and their potential impacts on the defendant's representation to determine whether good cause exists.  *United States v. Fields*, 483 F.3d 313, 352 (5th Cir. 2007).  This duty, however, "is not so formalistic as to require affirmative questioning when such is rendered unnecessary because the parties have volunteered all the relevant information for a court to determine that no substantial conflict exists."  *Id.*

Kasali argues the district court improperly focused on Stafford's and Kaper's abilities instead of asking "probing and specific questions" regarding the communication and quality of the attorney-client relationship.  *Id.*  Relying on Ninth Circuit caselaw, Kasali contends the district court's improper decision to ask "only open-ended questions and put the onus on [her] to articulate why appointed counsel could not provide competent representation" was a clear abuse of discretion.  *See United States v. Adelzo-Gonzalez*, 268 F.3d 772, 777 (9th Cir. 2001).  According to Kasali, her clear distrust and dissatisfaction with Kaper and Stafford based on their actions throughout their representation of her was a blatant conflict of interest warranting substitution.  *See Brown v. Craven*, 424 F.2d 1166, 1169 (9th Cir. 1970).

No. 21-20681

The Government argues Fifth Circuit precedent provides that a difference in the defendant's trial strategy and that of counsel does not signify a conflict of interest. *See Fields*, 483 F.3d at 353. Kasali's "[m]ere disagreement about strategic litigation decisions" — like presenting futile challenges to Kasali's pretrial release revocation and refusing to provide or discuss evidence — "is not a conflict of interest." *Id.* The Government further argues that, even if Kasali had presented a reasonable conflict, the district court's inquiry was sufficient.

The district court questioned Kasali at two *ex parte* hearings. During the first hearing, the court addressed Kasali's motions to substitute counsel by questioning Kasali about her concerns, questioning Stafford about her allegations, and determining that Kasali's concerns were "nonsensical" and that she had "excellent counsel." During the second hearing, the district court learned Kasali refused to cooperate with her attorneys, terminated a court-ordered meeting, and insisted her attorneys were ineffective because they failed to resolve her detention issue, which was not before the court. These hearings, according to the Government, "provided the district court with an ample basis for evaluating the extent of and reasons for the attorney-client breakdown." *See id.* at 352.

The court "paid close attention to the supposed source" of Kasali's distrust and dissatisfaction, *United States v. Simpson*, 645 F.3d 300, 309 n.6 (5th Cir. 2011), such that the Government argues there was no need for "probing and specific questions," *Fields*, 483 F.3d at 352. The district court, however, did ask targeted questions about Kasali's concerns with her counsel, the bases for those concerns, her understanding of her charges, and Kaper's and Stafford's explanations for their actions. Thus, it is clear the court directly inquired into "the asserted cause for [Kasali's] complaint[s]," and into Kasali's "own responsibility, if any, for th[e] conflict[s]" when it denied her motions. *Martel v. Clair*, 565 U.S. 648, 663 (2012).

"Because a [district] court's decision on substitution [of counsel] is so fact-specific, it deserves deference." *Id.* at 663–64. To overcome that deference, Kasali was required to show either a conflict of interest or a complete breakdown in communication. *See United States v. Gentry*, 941 F.3d 767, 776–77 (5th Cir. 2019). A conflict of interest warranting substitution will arise when a defendant shows "'that counsel's performance was deficient' and 'that the deficient performance prejudiced the defense.'" *Id.* at 776 (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). A complete breakdown in communication between an attorney and defendant can also constitute good cause unless "the breakdown can be attributed to the defendant's intransigence, and not to the neglect of defense counsel or the trial court." *Id.* at 777 (quoting *Simpson*, 645 F.3d at 308).

Kasali failed to make either showing. Regarding a conflict of interest, she did not explain how any of Stafford's or Kaper's actions were deficient other than to continuously reiterate that they had yet to resolve the non-issue of her pretrial confinement. Kasali also failed to explain how her distrust of either Stafford or Kaper prejudiced her defense or affected their representation. In fact, counsel pursued Kasali's requested motions despite thinking they were futile. As for a complete breakdown in communication, Kasali's actions show her unwillingness to cooperate, rather than Stafford's or Kaper's neglect, caused the breakdown.

Because Kasali's intransigence was the root cause of the attorney-client communication issues, the district court did not abuse its discretion in finding Kasali capable but unwilling to cooperate and denying her motions to substitute counsel.

## II.    *Voluntary waiver of presence at trial*

This court generally reviews a district court's determination that a defendant was voluntarily absent under Federal Rule of Criminal Procedure

43 for clear error and its decision to proceed with the trial for abuse of discretion. *United States v. Edwards*, 303 F.3d 606, 627 (5th Cir. 2002). In the absence of a contemporaneous objection, however, our review is for plain error. *United States v. Thomas*, 724 F.3d 632, 641 (5th Cir. 2013).

The parties dispute which is the appropriate standard of review and whether Kasali contemporaneously objected when the district court initially decided to proceed in her absence. Kasali seemingly argues plain error, harmless error, and abuse of discretion all apply because each of the district court's findings were separate constitutional violations subject to different standards of review. The Government asserts neither Kasali nor her counsel objected when the district court decided to proceed with jury selection, so plain error is the only appropriate review standard. It further argues Kasali concedes plain error is the applicable standard.

We pretermit this question and apply *de novo* review because, as explained below, we conclude the district court's actions were appropriate and Kasali's arguments fail under any standard. *See United States v. Pursley*, 22 F.4th 586, 591 (5th Cir. 2022); *United States v. Haggerty*, 997 F.3d 292, 296–97 (5th Cir. 2021); *United States v. Rodriguez*, 523 F.3d 519, 525 (5th Cir. 2008).

### a. Commencement of trial pursuant to Rule 43

A defendant has a constitutionally protected right to be present "at all stages of the trial where [her] absence might frustrate the fairness of the proceedings." *Thomas*, 724 F.3d at 642 (citations omitted). In other words, a defendant has "the right to be present at any [critical] stage of the criminal proceeding." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). Rule 43 articulates this right and requires a defendant "be present at . . . every trial stage, including jury impanelment." FED. R. CRIM. P. 43(a)(2). Rule 43 then explains the circumstances when a defendant may waive this right.

FED. R. CRIM. P. 43(c). "A defendant who was initially present" may waive her right to be present either by being "voluntarily absent after the trial has begun," or by being removed "for disruptive behavior." FED. R. CRIM. P. 43(c)(1)(A), (C).

For purposes of whether she was initially present under Rule 43, Kasali contends that the December 6, 2021, pretrial conference when her refusal to change out of her jail clothes caused her to be removed was not a part of the trial. She argues it was only when the voir dire of the jury began that the trial itself began, and she was not present in the courtroom at that time. The Government argues trial did begin with the pretrial conference when Kasali was present.

We recognize that, for purposes of Rule 43, the first critical stage of a trial that requires the defendant's presence will usually be jury selection. *Thomas*, 724 F.3d at 642. During jury selection, a defendant's "presence has a relation, reasonably substantial, to the ful[l]ness of [her] opportunity to defend against the charge." *Stincer*, 482 U.S. at 745 (citation omitted). We have yet to articulate, though, when jury selection itself starts. The only two circuits to do so concluded trial begins when court is called to order on the day jury selection begins. *See United States v. Sterling*, 738 F.3d 228, 236 (11th Cir. 2013); *United States v. Benabe*, 654 F.3d 753, 771–72 (7th Cir. 2011).

Both the Eleventh and Seventh Circuits have held that court was called to order and trial began under Rule 43 when a defendant was brought to a conference with the judge, counsel, and a court reporter following the defendant's refusal to participate. *See Sterling*, 738 F.3d at 233, 236–37; *United States v. Shanks*, 962 F.3d 317, 322–23 (7th Cir. 2020). The circuits considered otherwise requiring a "combative defendant" be brought into the courtroom just to satisfy Rule 43's "initially present" requirement "absurd." *Sterling*, 738 F.3d at 236; *see also Shanks*, 962 F.3d at 323.

We agree with that reasoning. Here, the district court held a conference before jury selection to resolve potential prejudice resulting from Kasali's refusal to participate in trial or to remove her jail clothes. The judge, counsel for both Kasali and the Government, and a court reporter met outside the jury room for the conference. The judge then brought Kasali in to establish a clear record of her unwillingness to proceed with voir dire and to inform her of her options to proceed.

Kasali's presence at the December 6, 2021, conference had a "reasonably substantial" relation to her defense, making it a sufficiently significant event to indicate the start of trial. *Stincer*, 482 U.S. at 745. Thus, for purposes of Rule 43, trial had indeed commenced.

### b.   *Rule 43(c) waiver provisions*

Kasali also argues the district court erroneously concluded she voluntarily waived her right to be present and proceeded to trial in her absence. Kasali insists she did not waive her right to be present because she neither voluntarily left the courtroom nor was so continuously disruptive as to justify removal.

Under Rule 43(c)(1)(A), a defendant's voluntary absence after trial has begun does not have a "stringent waiver requirement," and a court does not "need any type of waiver to exist on the record. Mere voluntary absence is sufficient to waive a Rule 43 right to be present." *Thomas*, 724 F.3d at 644 (quotation marks and citation omitted). This voluntariness can even "be implied from [a defendant's] actions." *United States v. Davis*, 61 F.3d 291, 302 (5th Cir. 1995).

Prior to proceeding with trial in a defendant's absence, however, "the district court must [first] determine . . . whether the defendant's absence is knowing and voluntary" by "inquir[ing] into the reason for the defendant's absence." *Id.* If it is knowing and voluntary, the court must then consider

"whether the public interest in the need to proceed clearly outweighs" the defendant's voluntary absence. *Id.* In doing so, the district court must "balanc[e] the likelihood that the trial could soon take place with the defendant's presence against the undue inconvenience or prejudice occasioned by a slight delay or a rescheduling of the trial." *United States v. Beltran-Nunez*, 716 F.2d 287, 291 (5th Cir. 1983).

Here, the district court determined Kasali waived her right to be present because she refused to change into street clothes, refused to answer the court's questions, refused to be present with her attorneys, and posed a risk of acting out during or interrupting the proceedings. Kasali contends this was error because she never suggested she did not want to be present, just that she wanted the court to consider her issues with her attorneys. In fact, she specifically stated she did "not waive [her] appearance" and was only protesting her specific counsel. Kasali further argues the district court failed to conduct its required *Beltran-Nunez* inquiry.

The Government asserts Kasali's refusal to change clothes and avoiding direct answers to the district court's questions "align[] with analogous case law" from other circuits such that she voluntarily waived her right to be present despite any "defiant statements" to the contrary. One such case is the Second Circuit's *United States v. Lucky*, 569 F.3d 101 (2d Cir. 2009) opinion. There, the defendant refused to participate in jury selection or change into civilian clothing, instead insisting the magistrate judge rule on certain pretrial motions. *Id.* at 104. When the judge refused, the defendant told the court it could "proceed without [his] presence," but he was "not waiving anything," despite leaving the courtroom. *Id.* The court repeatedly told the defendant that if he left, he would be waiving his presence and ultimately concluded he voluntarily waived his presence. *Id.* at 104–05.

The Seventh Circuit similarly concluded two district courts properly found defendants had waived their right to be present at trial. *See Shanks*, 962 F.3d at 323–24; *Benabe*, 654 F.3d at 767–71. In *Shanks*, the defendant "repeatedly refused" to answer the judge's questions, continued to protest a separate unrelated issue, and tried to resurrect a dead argument before the court. 962 F.3d at 324. The district court then considered the factors of rescheduling a trial the day witness testimony was to begin and the defendant's unwillingness to cooperate. *Id.* The circuit court held that the district court's subsequent conclusion that the defendant waived his presence was proper. *Id.*

The *Benabe* defendants continued a "tandem campaign of obstreperous interruptions and frivolous legal arguments," which resulted in a knowing and voluntary waiver of their presence. 654 F.3d at 769. They made repeated outbursts during the proceedings and refused to answer the district court's request that they behave in front of the jury. *Id.* at 769–70. The district court removed the defendants but clarified they were welcome to return to the proceedings if they acted appropriately. *Id.* at 770. The district court also considered the factors of delay and difficulty in rescheduling the trial, ultimately concluding the factors weighed in favor of moving the trial forward. *Id.* The Seventh Circuit found no constitutional error in this exclusion. *Id.*

Though we are not bound by these decisions, we find them sufficiently persuasive considering this record. Kasali refused to cooperate with the district court by not answering its questions and not changing into street clothes so she could participate in voir dire. She instead attempted to reraise and reargue issues not before the court and continued to protest Stafford and Kaper as her counsel. Although the district court neither repeatedly conveyed Kasali's actions could waive her presence nor explicitly stated Kasali could return to the proceedings once she acted accordingly, the

14

court's asking Kasali again after voir dire if she would cooperate communicated the court's desire to honor Kasali's right to be present. *See Illinois v. Allen*, 397 U.S. 337, 343 (1970) (clarifying that "the right to be present can . . . be reclaimed as soon as the defendant is willing to conduct himself . . . with . . . respect").

Further, the district court explained how it considered the *Beltran-Nunez* factors when it concluded Kasali's waiver was voluntary. It articulated each factor, provided counsel for both sides the opportunity to be heard on the issue, and concluded the factors supported a voluntary waiver. Although Kasali did not say the district court could proceed without her, the district court explained its decision to proceed was because of Kasali's unwillingness to cooperate. The court made the explicit finding that Kasali waived her presence at trial after voir dire was conducted in her absence.

We conclude Kasali's actions and continued misconduct were sufficient for the district court to imply a voluntary waiver of Kasali's presence under Rule 43(c)(1)(A). The district court's subsequent weighing of the *Beltran-Nunez* factors, including Kasali's unwillingness to cooperate, favored proceeding with voir dire in her absence. Because we find the district court's exclusion proper under Rule 43(c)(1)(A), we need not reach whether the exclusion was also justified under Rule 43(c)(1)(C).

The district court therefore did not err in proceeding with a portion of Kasali's trial in her absence.

## III.    *Sentence enhancement and restitution*

Kasali's final claims of error concern the district court's sentence enhancement calculation under United States Sentencing Guidelines § 2B1.1 and its restitution order. Kasali argues intended loss was an insufficient basis for both her 18-level sentence enhancement and the restitution amount

ordered. The Government asserts neither order is clearly erroneous under this circuit's precedent, and they should both be affirmed.

We generally review both a district court's application of the Sentencing Guidelines and the legality of restitution *de novo*. *United States v. McGavitt*, 28 F.4th 571, 575 (5th Cir. 2022); *United States v. Maturin*, 488 F.3d 657, 659 (5th Cir. 2007). Plain-error review will apply, however, if the defendant's objections to her sentence on appeal are based on different grounds than those in district court, *McGavitt*, 28 F.4th at 575, and if a defendant fails to object to the restitution amount in district court, *Maturin*, 488 F.3d at 659–60.

First, we consider Kasali's sentencing calculation. Kasali's objection in district court was to the *amount* of loss calculated, but she now objects to the *type* of loss upon which the district court relied. We thus apply plain-error review. Section 2B1.1 refers to "the loss," without ever defining the term, but the Guidelines commentary goes on to define "loss [a]s the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). A "court's loss determination is entitled to appropriate deference." § 2B1.1 cmt. n.3(C).

The Guidelines commentary interpreting or explaining a Guideline has for 30 years been binding on courts, and a failure to follow such commentary can constitute error.[2] *Stinson v. United States*, 508 U.S. 36, 42–

---

[2] In her initial brief, Kasali argued the Supreme Court's recent *Kisor v. Wilkie*, 588 U.S. 558, 574–77 (2019), decision replaced *Stinson*'s deferential standard and now mandates that "courts should not defer to the commentary [G]uidelines unless there is genuine ambiguity in the [G]uidelines." Our court recently clarified, however, that the *Stinson* standard requiring "us to follow the [Guidelines] commentary" "has not been overruled or modified." *United States v. Vargas*, 74 F.4th 673, 678, 680 (5th Cir. 2023) (en banc). Thus, a court's failure to follow the Guidelines commentary continues to be an incorrect and reversible application of the Guidelines. *Id.* at 680. In her reply brief, Kasali recognizes this court's *Vargas* decision, which was decided after she filed her initial brief,

43 (1993). Importantly, U.S.S.G. § 2B1.1 cmt. n.3(A) allows intended loss to be used to increase an offense level if the intended loss is greater than the actual loss. Such is the case here. The district court did not make an actual loss determination but found the specific intended loss of Kasali's crimes to be $3,813,444. Giving this loss determination the proper deference, we conclude the district court's Guidelines calculation based on intended loss and application of the 18-level enhancement was not plain error.

Next, we consider Kasali's restitution order. Kasali asserts the district court erred in awarding restitution to the SBA. Specifically, she argues there is no basis for a restitution order, and it is improper to allow the Government double recovery in the form of restitution and forfeiture of the loan amount. The Government argues that Kasali forfeited her arguments, and actual loss was inferred from the district court's granting the Government's objection.

"Restitution is remedial in nature; its goal is to make the victim whole. Forfeiture is punitive; it seeks to disgorge any profits or property an offender obtains from illicit activity." *United States v. Sanjar*, 876 F.3d 725, 751 (5th Cir. 2017) (citing *United States v. Taylor*, 582 F.3d 558, 566 (5th Cir. 2009)). These are two distinct remedies. *Id.* Relying on this court's *Sanjar* decision, the Government contends that forfeiture and restitution can both be ordered as remedies in the same case. The sole issue in *Sanjar*, however, was whether a district court could properly offset a restitution amount with any amount collected pursuant to a forfeiture order. *Id.* at 750. We concluded that a district court does not have the statutory authority to offset restitution with

---

forecloses her contention that *Stinson* no longer applies. Accordingly, she presents the argument only to preserve it for possible further review.

forfeiture amounts; that is the Attorney General's responsibility. *Id.* at 750–51.

Improper offset is not Kasali's argument. She asserts that the district court erroneously ordered restitution because the Government cannot be allowed a windfall by receiving both restitution and forfeiture of assets. In 2009, however, we held that district courts can order both restitution and forfeiture without it constituting double recovery. *Taylor*, 582 F.3d at 565–66.

Under the Mandatory Victim Restitution Act ("MVRA"), restitution must be ordered to an "identifiable victim" "directly and proximately harmed as a result" of certain defendant conduct, including fraud. 18 U.S.C. § 3663A(a)(2), (c)(1)(A)(ii), (c)(1)(B). The MVRA further clarifies restitution will be ordered in the full amount without consideration of whether the victim received compensation from "insurance or any other source." § 3664(f)(1)(B). If such compensation is received, restitution will be ordered to be "paid to the person who provided or is obligated to provide the compensation." § 3664(j)(1).

Both the MVRA and 28 U.S.C. § 2461(c) contain mandatory language that requires a district court to order full restitution and the forfeiture of property. *Taylor*, 582 F.3d at 565. The MVRA states a district court "*shall* order, in addition to[] . . . any other penalty authorized by law, that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1) (emphasis added). The forfeiture statute states "[i]f the defendant is convicted of the offense giving rise to the forfeiture, the [district] court *shall* order the forfeiture of the property as part of the sentence." 28 U.S.C. § 2461(c) (emphasis added).

"The MVRA does not permit restitution awards to exceed a victim's loss. . . . The court may not award the victim a windfall." *United States v.*

*Williams*, 993 F.3d 976, 980 (5th Cir. 2021) (quoting *United States v. Beydoun*, 469 F.3d 102, 107 (5th Cir. 2006)).  We interpret the MVRA to be limited "to the *actual* loss directly and proximately caused by the defendant's offense of conviction," not the intended loss.  *Id.* (quoting *United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012)).  The MVRA places "[t]he burden of demonstrating the amount of the loss sustained by a victim as a result of the offense" on the Government and "[t]he burden of demonstrating such other" appropriate matters on the party designated by the court.  18 U.S.C. § 3664(e).  This establishes "a burden-shifting framework for loss-amount calculations."  *Williams*, 993 F.3d at 980.  The Government must first establish actual loss to one or more victims by a preponderance of the evidence, and the defendant can then attempt to rebut that evidence.  *Id.* at 980–81.

Here, the district court made no explicit finding of actual loss.  Kasali argues the failure to do so paired with the PSR's statement that "no restitution is outstanding in this case" proves the district court could not order restitution.  The Government contends the district court "necessarily found actual loss in the amount the [G]overnment urged" when it sustained the Government's objections to the PSR regarding restitution and the intended loss amount.

It is unrefuted that the SBA guaranteed the loan approved for Lola's Level in the amount of $1,937,500; the loan amount was deposited in Kasali's accounts; and the full loan amount was frozen and recovered prior to Kasali's obtaining the money.  The PSR equates the seizure of these funds to an offset of the restitution because the loan was "ultimately recovered in full."  The Government objected to this classification, asserting the SBA was entitled to restitution because seeking forfeiture does not bar an additional restitution amount; restitution is a mandatory component of sentencing; and the SBA was the victim of Kasali's crime.  In support of the sought-after restitution

amount, the Government provided an SBA Certified Statement of Account record establishing the total debt owed on the loan plus interest. Despite the lack of "actual loss" language, this loan documentation mirrors evidence relied on by other district courts when making actual loss determinations. *See id.* at 981; *Sharma*, 703 F.3d at 323–24. The district court agreed with the Government's objection and ordered restitution.

It is a common practice to order both restitution and forfeiture. *See generally Sharma*, 703 F.3d at 322–27; *Sanjar*, 876 F.3d at 748–51; *Taylor*, 582 F.3d at 565–68. These cases focused on whether restitution and forfeiture were properly calculated or offset, not whether allowing both remedies was proper. Indeed, the latter is a non-issue here. In fact, the Department of Justice Asset Forfeiture Policy Manual explains how the separate remedies interconnect. *See* U.S. Dep't of Just., Asset Forfeiture Policy Manual (2023). An entire chapter is dedicated to the process for seizure and restraint of property, which occurred here when the loan was seized from the bank prior to Kasali's obtaining it. *Id.* at ch. 2. Another chapter then explains the separate forms of victim compensation. *Id.* at ch. 14.

Forfeiture of assets by the Government is part of the recovery process of fraud crimes, and the DOJ seeks eventually to return those forfeited assets to victims. *Id.* at ch. 14, § I. One of the three primary ways to pay victims is restitution, which is "the process of determining victim losses for purposes of sentencing and paying victims in criminal cases." *Id.* It is "a court-ordered equitable remedy intended to make crime victims whole and prevent unjust enrichment." *Id.* The DOJ explains how "restitution and forfeiture are mandatory and independent parts of a criminal sentence, [and] the forfeited assets may not be used to satisfy the restitution order if other assets are available for that purpose." *Id.* at ch. 14, § II.B.2.

There are special considerations, however, when the victim is a federal government entity, like the SBA, which often suffer pecuniary losses from fraud crimes dealing with funded programs like the PPP loan program. *Id.* at ch. 14, § II.D.  "The act of forfeiting the seized assets and depositing the proceeds into the Assets Forfeiture Fund (AFF) . . . does not mean that the seizing agency has received victim compensation.  Rather, the victim agency should either (1) be included in the restitution order, with a specified pecuniary loss amount, for restoration request purposes, or (2) file a petition for remission requesting compensation for its losses from the proceeds of the forfeited assets."  *Id.* (emphasis and footnote omitted).

Because the forfeited $1,937,500 given to the DOJ to deposit into the AFF did not provide restitution to the SBA or make it whole in this instance, the district court properly included the SBA in the restitution order.  It is the DOJ's policy, if the SBA does not receive the required restitution amount from Kasali, to transfer funds to the SBA upon petition to the court.

AFFIRMED.